**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION
CASE NO. _____**

Ramsi A. Woodcock,

*Plaintiff*,

v.

Gregory Van Tatenhove,
Eli Capilouto (in his official and individual capacities),
Robert DiPaola (in his official and individual capacities),
University of Kentucky;

*Defendants.*

**VERIFIED COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF**

1

**INTRODUCTION**

1.      Unique among all professionals, a scholar's professional identity depends entirely on his membership in his professional community and disappears the moment that community shatters. What makes him a scholar as opposed to a researcher is that his professional advancement depends upon the judgment of the quality of his work by other scholars and that his research is therefore influenced by and indeed the collaborative product of a community of scholars—and that community alone. This is called "peer review". It is this exclusive dependence on the esteem of other scholars that gives his work a claim to credibility and expertise because it signals that his conclusions have not been influenced by special interests but only by the judgment of other people who have dedicated their lives to the search for truth. Ex. 27. The competence of no other professional is derivative of his association with other professionals in this way. A football player may be just as good at tackling whether he has been picked for the team or not. A surgeon may be just as good at surgery whether he is licensed or not. If the football player is cut or the surgeon deprived of his license, he is merely prevented from practicing his art. But a scholar stripped of membership in a community of scholars stops being able to perform at all. His work is no longer subject to peer review and so whatever he writes thereafter will not be the product of the collaborative search for truth that we trust as "scholarship".[1] His claim to credibility on the basis of peer review will be nil.

Defendant the University of Kentucky ("University"), through its president, Defendant Eli Capilouto, and provost, Defendant Robert DiPaola, just stripped the faculty of the University's J. David Rosenberg College of Law ("law school") of their ability to claim credibility for their work on the basis of peer review. On March 6, 2026, DiPaola announced that Defendant Gregory Van

---

[1] Independent scholars lay claim to being scholars only to the extent that their research is vetted by other scholars, such as through publication in peer reviewed journals.

Tatenhove would be the law school's next dean. Ex. 17. His start date is July 15, 2026. Ex. 11. Van Tatenhove is a non-scholar whom the faculty had rejected in February as "unacceptable" for the position due to his lack of "the necessary qualifications (including a record of scholarship)" to lead the faculty. Exs. 7, 8. As dean, Van Tatenhove's job will be to rate the performance of faculty based on the quality of their scholarship. AR 3:10 Perf. Rev. § A.1, Ex. 23; Admin. Rev. — Univ. Org. §§ F.2.c, F.2.e, Ex. 22. He will have the power to recommend termination of a faculty member for nonperformance regardless of the views of the rest of the faculty and regardless of whether the faculty member has tenure. *Id.* at § F.2.c; Ky. Rev. Stat. § 164.230(5). As a result of his appointment, no member of the faculty, including Plaintiff Ramsi A. Woodcock, can continue to claim that his professional advancement depends in substantial part upon judgments of the quality of his research by those determined by the faculty to be fit to make them. The faculty has been deprived of its ability to claim that it is engaged in scholarship.

2.      A faculty is the ultimate expressive association because, as already noted, its members are unable to express themselves as scholars other than through their association with each other in a collaborative search for truth. And the First Amendment provides robust protection for the right of Americans to associate to express a message, such as the faculty's message that its work is subject to peer review. The University's appointment of Van Tatenhove over the objection of the faculty dilutes the faculty's message of peer review and indeed compels the faculty to send the opposite message—that their research is subject to the judgment of someone whom they have collectively determined to be unfit to review their work.  As such, it violates Woodcock's First Amendment right to expressive association.

3.      The appointment of Van Tatenhove also violates Woodcock's employment agreement, which states that the University and its employees, including Capilouto and DiPaola, "must comply with . . . accreditation requirements". Exs. 20, 21. The American Bar Association

(ABA), which accredits the law school, prohibits the appointment of a dean over the objection of the faculty. ABA Standards Interp. 203-1, Ex. 19. The ABA further requires that a dean be a tenured member of the faculty. *Id.* at Standard 203(b). In effective acknowledgment of Van Tatenhove's lack of a scholarly record, the University has said that it will not put Van Tatenhove up for tenure. Ex. 14 at 7. The ABA provides an exception to these rules for "good cause" or in "extraordinary circumstances". Ex. 19. But the faculty approved three other University-selected finalists who, unlike Van Tatenhove, met the qualification for the dean role and on information and belief the University did not make offers to any of them before selecting Van Tatenhove. Ex. 8; Woodcock Decl. ¶ 22. (One of the other finalists has said that she would have accepted an offer. Ex. 28.) As a Judge on the U.S. Court of Appeals for the Eastern District of Kentucky, Van Tatenhove recently presided over a case involving an alleged violation of the same rule requiring compliance with accreditation requirements that is part of Woodcock's contract. Ex. 42. And during the application and interview processes, he should have also familiarized himself with the University and law school's policies and faculty contracts. Despite this, Van Tatenhove forged ahead with his candidacy for dean and then defended his appointment against public outcry. Exs. 13, 43. In doing so, he tortiously interfered with Woodcock's employment agreement.

## PARTIES

4.      ***Ramsi A. Woodcock*** is Edward H. Metcalf Jr. Professor of Law at the J. David Rosenberg College of Law ("law school") of the University of Kentucky ("University"). Woodcock associates with the law faculty in order to send the message that his professional advancement depends upon the judgment of his scholarship by people determined by the faculty to be qualified to render such judgments. He joined the faculty as an Assistant Professor in 2018. Based on a review of his scholarship, teaching, and service, the faculty recommended him for promotion to Associate

Professor with tenure in 2022 and to Full Professor in 2025. The University duly granted him tenure and appointed him to those positions.

5.    ***Gregory Van Tatenhove*** is a Judge in the United States District Court for the Eastern District of Kentucky.  Ex. 7. Prior to his appointment to the bench in 2006, he was United States Attorney for the Eastern District of Kentucky for four years, chief of staff to a U.S. congressman for six years, and a trial attorney for three years in the U.S. Department of Justice. *Id.* He has no experience in academic administration, has never held a full-time job as a law professor, and lists no scholarly publications on his CV. *Id.* On March 6, 2026, the University announced that he would be the next dean of the law school. His start date is July 15, 2026. Ex. 17.

6.    ***Eli Capilouto*** is the President of the University of Kentucky. The University of Kentucky Board of Trustees ("board") has delegated to him "the authority to . . . appoint . . . all employees", "promulgate and implement *Administrative Regulations*", "supervise and administer all phases of the University", and "take all measures necessary to comply with state and federal law as well as the requirements of all accrediting bodies." Governing Reg. III —The President § B, Ex. 37. Jointly with DiPaola, Capilouto reviews feedback regarding dean candidates and selects deans. Ex. 14, 6–7.

7.    ***Robert DiPaola*** is the Provost of the University of Kentucky. As Provost, DiPaola "is the chief academic officer for the University", "is responsible for faculty employee functions", and "has the authority to manage the employment" of "the faculty." Admin. Reg. 1:1 § IV.F, Ex. 66 (possibly superseded by Admin. Reg. — Univ. Org, Ex. 22.). He "reviews and recommends to the President and the Board of Trustees on faculty appointment, reappointment, and tenure matters." *Id.* DiPaola "appoint[s]" "[s]earch committees for deans of colleges". Admin. Reg. — Univ. Appts. (Formerly GR VIII) § A.3. Jointly with Capilouto, DiPaola reviews feedback regarding dean candidates and selects deans.

8.      *University of Kentucky* ("University") is the Commonwealth of Kentucky's flagship public university and a top-tier research university in the United States. Its mission is to "[e]xpand[] knowledge through . . . scholarship[.]" Ex. 18. It is governed by a Board of Trustees that has delegated its authority to appoint deans to Capilouto in his capacity as president of the University. Governing Reg. III —The President § B, Ex. 37.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over Woodcock's federal constitutional claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). This Court has supplemental jurisdiction over Woodcock's state law claim pursuant to 28 U.S.C. § 1367(a) because the state law claim is "so related to" the federal constitutional claims "that they form part of the same case or controversy".

10.      This district is an appropriate venue for this action under 28 U.S.C. § 1391 because the defendants are located here and the actions that Woodcock alleges occurred in this district.

## FACTUAL ALLEGATIONS

11.      As outgoing University board member Hollie Swanson observed in remarks to the board on June 30, 2026, Capilouto has governed the University in a "top-down" fashion.[2] Until this spring, the most notable example of this approach was his successful 2024 push to dissolve the University's faculty senate. Exs. 67, 68. In the wake of the senate's dissolution, the University sought to learn the identity of the faculty senators who had passed a vote of no confidence in Capilouto, forced out the senate's last president, and, in exchange for settling her employment claims, insisted that she promise not to exercise her right to seek records regarding her ouster. Exs. 67, 68.

---

[2] Jesse Fraga, *A Critical UK Trustee is Leaving. How Does She Feel about the University on Her Way Out?*, Lexington Herald Leader (Jul. 2, 2026), https://www.kentucky.com/news/local/education/article316342536.html.

12.     It is against this backdrop that the University undertook a search for a new dean of the law school over the past academic year. At least for the past half century, the University had never appointed a dean of the law school over the objection of the faculty. Ausness Decl. ¶ 3. And, with the single exception of the outgoing interim dean, who served from 2025 to 2026, deans of the law school had, at least for the past half century, always pursued a career as a law professor prior to becoming dean. Ausness Decl. ¶¶ 1, 3, 6. That changed earlier this year.

13.     Between January 16, 2026 and February 3, DiPaola brought four University-selected finalists for the position of dean of the law school to campus to participate in open fora with the University community. Exs. 1, 2. The final candidate to visit was Van Tatenhove, who was described by the University during the search process as "Candidate D". Woodcock Decl. ¶ 25. On February 4, after the conclusion of the campus visits, Joshua Douglas and Beau Steenken, acting in their capacity as Associate Deans of the law school, sent an email to DiPaola, copying George Wright, who is "Senior Advisor to the President". Ex. 8, 10; Woodcock Decl. ¶ 26. The email stated that "[t]he views expressed here are the collective views of the faculty". The email informed DiPaola that a "substantial majority of the faculty found" three of the finalists to be "acceptable." Ex. 8. The email stated that these finalists "all possess" "academic [administrative] experience" and "a strong scholarly record." *Id.* The email further stated, however, that a "substantial majority of the faculty found Candidate D to be unacceptable to be our next Dean." *Id.* The email explained that

> [f]aculty expressed that Candidate D does not exhibit "progressive and broad academic administrative leadership experience arising from a senior-level administrative role such as department chair, center director, associate dean, or dean." Additionally, a substantial majority of the faculty expressed concern that Candidate D does not possess the necessary qualifications (including a record of scholarship) to be granted tenure under the Rosenberg College of Law's current rules, such that their appointment would fail to satisfy ABA Rule 203(b), which calls for the Dean of a law school to be appointed as a member of the faculty with tenure.

*Id.*

7

14.     Capilouto and DiPaola jointly review feedback on dean candidates and jointly select deans. Ex. 14 at 6–7. On information and belief, they did not make an offer to any of the three finalists approved by the faculty. Woodcock Decl. ¶ 22. They also did not solicit individual "written statements from at least the tenured members of the college" regarding the appointment, as required by University regulations. Admin. Reg. — Univ. Appts. (Formerly GR VIII) § A.3.[3] Instead, on February 27, they made an offer to Van Tatenhove to become the next dean of the law school. Ex. 11. The offer letter, which was signed by DiPaola, stated that Van Tatenhove would be the "chief academic . . . officer" of the law school. *Id.* It further stated that Van Tatenhove would be required to "[c]reate and implement clear" "research priorities" "agree[d] upon" with DiPaola and that these "priorities" "should be established within [his] first year." *Id.* In exchange, Van Tatenhove would receive a salary of $442,000 per year. *Id.* In the event that the University were to remove him "without cause" in the first three years of his six-year contract, he would continue to receive his salary for three years, amounting to a golden parachute of $1.3 million. *Id.* This appears to be the first time that the University had ever promised a golden parachute to a law school dean. *See* Exs. 63–65. Van Tatenhove's salary was also $62,000 higher than the salary of the previous dean. Ex. 65. And it came on top of the $249,000 annual pension that Van Tatenhove would receive from the federal government upon retiring from the bench.[4] Van Tatenhove accepted the offer on or before March 3 and DiPaola publicly announced the appointment on March 6. *Id.*; Ex. 17.

15.     Woodcock associates with the law faculty in order to send the message that his professional advancement depends upon the judgment of his scholarship by people determined by the faculty to be qualified to render such judgments, a process known as "peer review". Woodcock

---

[3] https://regs.uky.edu/sites/default/files/2026-04/administrative-regulation-university-appointments.pdf .

[4] A federal judge who retires after his years on the bench and his age sum to eighty receives a pension at a rate equal to his annual salary. 28 U.S.C. § 371(a), (c). Van Tatenhove was born in 1960 and appointed to the bench in 2006. Exs. 7, 50. The current annual salary of a federal district judge is $249,000. Ex. 49.

8

Decl. ¶¶ 1–8. This message of peer review certifies to the public that his research conclusions have been subject only to the influence of other people who, like him, have dedicated their lives to the search for truth. *Id.*; Ex. 27. Absent that certification, his writing cannot command the special respect and attention directed by the public toward the conclusions of academics. *Id.* It is, in other words, the platform that permits Woodcock to command the attention of the public. *Id.* Without it, his research conclusions are accorded no more value or respect by the public than the conclusions of researchers in industry, thinktanks, or advocacy organizations. *Id.* As the American Association of University Professors ("AAUP") noted in the 1915 Declaration of Principles on Academic Freedom and Academic Tenure, "[t]he lay public is under no compulsion to accept or to act upon the opinions of the scientific experts whom, through the universities, it employs" except "to the extent" that the "conclusions" of those experts are "motiv[ated]" by "a desire for the respect of their fellow experts". *Id.* at 294. To the extent that Woodcock's conclusions are not subject to peer review, but instead are subject to the review of "the individuals who endow or manage universities", his "proper influence" "upon public opinion is diminished and vitiated[.]" *Id.* at 295–95. The faculty, including Woodcock, send this message of autonomy when the faculty declare their mission to be to "engage in robust exploration and dissemination of ideas" and to "advanc[e]" "legal knowledge" through "scholarship." Ex. 29; L. Fac. R. & Pol'ys § 13.B, Ex. 30. As the AAUP has noted, whenever a faculty declares that its "purpose is" "to advance knowledge", it seeks to convey the message to the public that the scholarship and teaching of its members has or will be "tested" by people "trained for, and dedicated to, the quest for truth" rather than by "the opinions or prejudices of men who have not been set apart or expressly trained for the scholar's duties." Ex. 27 at 294–95, 300.

16.    DiPaola's announcement of Van Tatenhove as the next dean immediately impaired Woodcock's ability to leverage his association with the law faculty to send his message of peer review. Woodcock Decl. ¶¶ 10–13. From that moment onward, he could reasonably expect that in

substantial part his professional advancement would depend upon the judgment of his scholarship by someone determined by the faculty to be unqualified to render such judgments. *Id.* The public could have such a reasonable expectation as well. *Id.* Although the public may not have learned that the faculty had rejected Van Tatenhove until April 13, when Woodcock published an opinion piece in the Louisville Courier Journal opposing the appointment, the public knew from the career highlights listed in DiPaola's March 6 announcement that the University had hired a new dean lacking any academic administrative experience or scholarly record.[5] Ex. 17. From that point on, the public could reasonably expect that Woodcock's writing and speaking would be influenced by a desire to please a non-scholar incoming dean. Woodcock Decl. ¶¶ 10–13. Woodcock's writing and speaking after the announcement included the uploading of three new or revised papers on the economic analysis of law to the Social Science Research Network (SSRN) public repository of legal research and his remarks as a participant in a scholarly roundtable at the Law and Society Annual meeting in San Francisco. Woodcock Decl. ¶ 13.

17. Woodcock would have every reason to distort his research conclusions to please Van Tatenhove because a law school dean can destroy a faculty member's career by making a negative evaluation of his scholarship. According to University regulations, the dean is ipso facto a "member[]" and "chair of the college faculty[,] and an ex officio member of all college committees", including the Retention, Promotion and Tenure Committee. Admin. Reg. — Univ. Org. §§ E.3.a, F.2.c, Ex. 22; L. Fac. R. & Pol'ys § 14.A, Ex. 30. Because the law school does not have departments, the dean exercises the powers of a department chair in addition to those of dean, which include "the periodic evaluation of" faculty members. Admin. Reg. — Univ. Org. at §§ F.2.c, F.2.e, Ex. 22. Such evaluations include "a qualitative judgment of the faculty employee's . . . scholarship[.]" AR 3:10

---

[5] Ramsi A. Woodcock, *UK Law School is Ignoring Faculty, Risking Its Accreditation*, The Courier-Journal, https://www.courier-journal.com/story/opinion/contributors/2026/04/13/uk-law-school-dean-judge-greg-van-tatenhove-accreditation-faculty-objection-andy-barr/89550365007/.

Perf. Rev. § A.1, Ex. 23. Based on this evaluation, the dean is "responsible for recommendations" to Capilouto on "salaries", "appointments", "promotions", and "decisions not to reappoint". Admin. Reg. — Univ. Org. at § F.2.c, Ex. 22. Under Kentucky law, "[f]ailure to meet performance" "requirements may result in removal of a" "professor regardless of" tenure "status." Ky. Rev. Stat. § 164.230(5). The dean may "depart from recommendations of [the rest] of the college faculty" and "speaks for the college." Admin. Reg. — Univ. Org. § F.2.c, Ex. 22.

18. The impairment of Woodcock's ability to send the message of peer review has inflicted economic loss on Woodcock. He left a job at WilmerHale, a top corporate law firm, to go into academia, taking a 50% pay cut at the time. Woodcock Decl. ¶ 1. And he took another pay cut (he believes) to move to University of Kentucky from a position on the tenure track at Georgia State University because the provost at Georgia State at the time had a record of interfering in the promotion decisions of the faculty at that school. Woodcock Decl. ¶ 7–8. These pay cuts were a net gain for Woodcock because the University promised him a number of valuable services in return, one of which was the platform for his scholarly conclusions that the ability to send the message of peer review provides. *Id.* at ¶¶ 7–9. Woodcock requested information regarding the extent of University interference in faculty decisionmaking before he accepted his offer. *Id.* at ¶ 8. The announcement of Van Tatenhove's appointment deprived Woodcock of the benefit of that bargain.

19. The loss inflicted on Woodcock was particularly large, and included mental emotional, reputational, and dignitary harm, because Woodcock was already living with the consequences of the appointment of a non-scholar dean. *Id.* at ¶ 23. The University appointed James Duff as interim dean in early July, 2025, on information and belief without consulting the faculty. Ex. 56; Woodcock Decl. ¶ 22. On July 18, 2025, Duff suspended Woodcock from teaching and banned him from the law school building. *Id.* In sworn testimony, Duff later explained that he had made a "judgment call" to suspend Woodcock based on Woodcock's speech about Palestine

11

because, in Duff's opinion, the speech "wasn't" "academic work" and he felt that "the taxpayers of Kentucky should not have to fund someone's personal viewpoints". Ex. 52 at 184, 194. Like Van Tatenhove, Duff had no prior academic administrative experience and was not a scholar. Ex. 54. By contrast, the interim dean who immediately preceded Duff was a longtime member of the University faculty. Woodcock Decl. ¶ 22. Like Duff (a pallbearer at Chief Justice Rehnquist's funeral) and Van Tatenhove (nominated for the bench by U.S. Senator Mitch McConnell, the former Senate Republican Leader), Salamanca was well connected in Republican circles, having served in the first Trump Administration. *Id.* But he did not retaliate against Woodcock's speech regarding Palestine. *Id.* Instead, he defended Woodcock's right to speak about Palestine at faculty meetings. *Id.* The effect of Duff's actions on Woodcock's platform was severe, but the temporary nature of Duff's appointment imposed a limit on the harm. *Id.* at ¶ 23. The appointment of a man with the same lack of scholarly experience as Duff as permanent dean removes that temporal limit. *Id.*

20.     In their email to DiPaola, the faculty had noted that his appointment violated accreditation standards of the American Bar Association (ABA). Ex. 8. ABA accreditation plays a key role in the viability of the law school. Students cannot obtain federal student loans to attend law school unless the school is accredited by the ABA. 20 U.S.C §§ 1001(a)(5), 1070(a). And, short of petitioning the Kentucky Board of Bar Examiners for an exemption, a law school graduate cannot obtain a license to practice law in Kentucky without having graduated from an ABA-approved law school. Ky. R. Sup. Ct. 2.014(1), (3).

21.     The ABA's Standard 203(b) (contained in the ABA's 2025-2026 Standards and Rules of Procedure for Approval of Law Schools) provides that "[e]xcept in extraordinary circumstances, a dean shall also hold appointment as a member of the faculty with tenure." Ex. 19. In his announcement of the appointment, DiPaola stated that the appointment was "pending approval of the Board of Trustees". Ex. 17. Because such appointments require board approval but the

12

appointment of administrators does not, that implied that Capilouto and DiPaola were planning on granting Van Tatenhove a tenured position on the faculty notwithstanding the faculty's view that Van Tatenhove "does not possess the necessary qualifications (including a record of scholarship) to be granted tenure under the Rosenberg College of Law's current rules". Governing Reg. II — The Board of Trustees § H.2.[6] But the University later backtracked, stating that Van Tatenhove did not seek a tenured appointment. Ex. 14 at 7.

22. Another provision of the ABA rules, Interpretation 203-1, provides that "[e]xcept for good cause, a dean should not be appointed or reappointed to a new term over the stated objection of a substantial majority of the faculty." Ex. 19. In their email, the faculty had stated that a "substantial majority of the faculty found [Van Tatenhove] to be unacceptable to be our next Dean." Ex. 8.

23. AAUP statements provide guidance about what counts as "good cause" and "extraordinary circumstances" under ABA rules. The AAUP's 2006 Statement on Faculty Evaluation of Administrators makes clear that administrators must (1) provide "compelling" reasons why they have chosen to "overrid[e]" "the faculty['s] judgment" that other candidates should have been chosen and (2) "state[]" those reasons "in detail." Ex. 32 at 129.

24. The only reasons that DiPaola's announcement provided for the appointment of Van Tatenhove were that Van Tatenhove had served on "various organizational committees" while a judge, taught a course as an adjunct instructor at the law school, and had "experience advancing strategic goals and engaging with broad groups of internal and external stakeholders". Ex. 17. These reasons did not appear to Woodcock to describe the "good cause" or "extraordinary circumstances" necessary to set aside ABA Interpretation 203-1 or ABA Standard 203(b). The faculty had approved

---

[6] https://regs.uky.edu/sites/default/files/2026-04/gr-ii-the-board-of-trustees.pdf .

13

three other University-selected finalists for the position and on information and belief Capilouto and DiPaola had not made an offer to any of them before selecting Van Tatenhove.[7] Ex. 8.

25. The University and its employees, including Capilouto and DiPaola, have an incentive to follow ABA rules because noncompliance can lead the ABA to impose sanctions on the law school, including the withdrawal of accreditation.[8] The University's own governing and administrative regulations also specifically command the University, Capilouto, and DiPaola to follow ABA rules independently of whether the ABA imposes a sanction for their violation. The administrative regulation titled "Employee Code" promulgated by Capilouto and binding on him and DiPaola as University employees states that "employees must comply with . . . accreditation requirements." Admin. Reg. — Employee Code § D, Ex. 20. The ABA standards and interpretations are "accreditation requirements" for the law school. And the governing regulation issued by the board that directs the president of the University to "develop" "codes of conduct" such as the Employee Code declares that "[t]he decisions and behaviors of members of the University community shall be guided by the core value[] of" "personal and institutional responsibility and accountability". Governing Reg. I — Decl. Princs. § E, Ex. 26.

26. The governing and administrative regulations legally bind the University to abide by accreditation requirements because the governing and administrative regulation are part of Woodcock's employment contract. The offer letter that Woodcock and the law school dean signed when Woodcock joined the faculty in 2018 describes the position to which the University appointed

---

[7] This was not the first time that Capilouto and DiPaola had placed the law school in violation of ABA rules. After Capilouto and DiPaola imposed what was described as a debt obligation on the law school that effectively diverted large shares of law student tuition away from law school operations, the ABA concluded in early 2023 that the University was "not in compliance with [ABA] Standard 202(a)", which provides that "anticipated financial resources available to the law school shall be sufficient for it to" "carry out its program of legal education." Ex. 70. After the University backtracked, the ABA ruled later that year that the University had come back into compliance. Ex. 71.

[8] Rules of Procedure for Approval of Law Schools 2025-2026,
https://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/standards/2025-2026/2025-2026-rules.pdf .

Woodcock using terms that are only defined in University regulations (e.g., it appoints him "Assistant Professor" in "our Regular Title Series", two terms that are defined only in Administrative Regulation 2.1-1 § V.A. and Administrative Regulation 2.2-1 § III.B.1(a)) and states that his "responsibilities" are "as outlined in the . . . University of Kentucky rules and regulations." Ex. 21. Both the offer letter and the governing and administrative regulations concern the rights and duties of employees. Woodcock has worked continuously for the University since 2018 while various iterations of the governing and administrative regulations, including Governing Regulation I, with its promise of institutional accountability, and the Employee Code, with its requirement of compliance with accreditation requirements, have remained in effect. The language of the governing and administrative regulations uses phrases such as "shall be" and "must comply". Moreover, the Faculty Handbook refers to "the contract between the faculty member and the institution" and states that "[s]pecific questions regarding the rights and duties of University employees - including faculty employees - can only be resolved by reference to the appropriate official documents", which the Faculty Handbook describes as including "the Governing Regulations, and the Administrative Regulations[.]" Ex. 40. And Woodcock was granted tenure under this agreement in 2022.

27.     Van Tatenhove was aware that law faculty such as Woodcock had a binding contractual right to the University's compliance with accreditation requirements. His role as Judge on the U.S. District Court for the Eastern District of Kentucky required him to be aware of it. Starting in 2020, Van Tatenhove presided over a lawsuit filed against the University by a tenured professor who had been charged by the University with violating the section of a predecessor of the University's current Employee Code that required compliance with accreditations rules. Ex. 42; Governing Regulation XIV § B, Ex. 41. If those rules were not part of the professor's contract, his violation of the rules could not serve as a basis for terminating him. One of Van Tatenhove's six separate opinions in the case discussed a University governing regulation and the tenured faculty

15

member's contract in detail. *Cunningham v. Blackwell*, 568 F. Supp. 3d 799, 813–16 (E.D. Ky. 2021). Van Tatenhove was also aware of the Kentucky legal doctrine recognizing personnel policies, such as the Employee Code, as contracts binding on employers because he had applied the doctrine in another case. *Fbk Partners, Inc. v. Thomas*, No. Civil No. 09-292-GFVT, slip op. 11-12 (E.D. Ky. Nov. 30, 2010) (discussing *Parts Depot v. Beiswenger*, 170 S.W.3d 354, 362–63 (Ky. 2005)).

28.     Faculty reaction to Van Tatenhove's appointment was predictably negative. Douglas Michael, who is Thomas P. Lewis Professor of Law and a former Associate Dean of the law school, wrote to DiPaola: "Good people will leave. You have made us a laughingstock among law schools. New candidates – faculty, staff, and students – will be repelled. And who can blame them?" Ex. 36.

29.     All University employees have a duty to "report incidents that may constitute a violation of any . . . accreditation requirements." Admin. Reg. — Employee Code § E.1, Ex. 20. Failure to do so can result in termination. *Id.* at § E.2. Accordingly, on March 11, Woodcock emailed a report of the violations of Standard 203(b) and Interpretation 203-1 to the board. Ex. 61. On March 12, he sent a similar report to Capilouto. Ex. 62. He received no response. On April 3, Woodcock filed a complaint with the ABA but received no immediate response.[9] Ex. 59. On April 13, Woodcock published an opinion piece in the Louisville Courier Journal stating that Van Tatenhove had been appointed over the objection of the faculty.[10] He wrote that

> [t]he ABA requires that law schools respect the faculty's views for a reason. Scholars are in the business of producing knowledge. And freedom of thought is an essential input into the production of knowledge. But there's only one group in a university that

---

[9] According to the ABA, if the ABA "concludes that the complaint does not raise issues relating to an approved law school's compliance with the Standards, the matter will be closed." Ex. 58. In this case, however, the ABA chose to investigate. On June 9, the ABA wrote to Woodcock that "[a]fter a thorough review of your complaint the [ABA] Council [of the Section of Legal Education and Admissions to the Bar] has determined that the complaint may raise issues relating to the Law School's compliance with the Standards. The Managing Director's Office will send the complaint to the Law School and request that the school provide a response[.]" Ex. Ex. 60. Woodcock does not know the status of the ABA's investigation because, according to the letter, "all matters relating to the accreditation of a law school are confidential" and the letter is "the final communication [he] will receive in response to [his] complaint." *Id.*

[10] Ramsi A. Woodcock, *UK Law School is Ignoring Faculty, Risking Its Accreditation*, The Courier-Journal, https://www.courier-journal.com/story/opinion/contributors/2026/04/13/uk-law-school-dean-judge-greg-van-tatenhove-accreditation-faculty-objection-andy-barr/89550365007/.

is likely to stand up to the incessant demands from pressure groups that professors adhere to the ideological orthodoxy du jour: the professors themselves. Professors cannot resist outside pressure, however, if they cannot choose their own leaders.[11]

30.     On April 21, Kentucky Governor Andy Beshear expressed "concern[]" on Facebook that "the new dean of law was the only candidate not recommended by law school faculty". Ex. 12. He wrote that "I've been told that despite previously saying the dean must be approved by UK's Board of Trustees, the university has shifted and now states that approval is not needed." *Id.* He urged the University community to "ask" "tough questions" at the next board meeting. *Id.* After the Kentucky Republican Party and the Republican speaker of the Kentucky House, for whom Van Tatenhove's wife serves as general counsel, publicly defended the appointment, Beshear followed up the next day on X, writing that "[s]ince yesterday I have received countless calls and messages agreeing that the University of Kentucky needs to reconsider its recent actions." Ex. 47. He continued: "[t]he fact that a political party defended the law school dean's appointment is telling. Kentuckians deserve a nonpartisan university[.]" *Id.* In early 2025, former interim dean Paul Salamanca disclosed to Woodcock that U.S. Senator Mitch McConnell and U.S. Congressman Andy Barr had both called the University to lobby for Salamanca to be appointed permanent dean. Woodcock Decl. ¶ 19. (He was ultimately passed over.) On March 6, the day DiPaola announced Van Tatenhove as dean, Barr issued a press release celebrating the appointment of his "friend" Van Tatenhove. Ex. 25.

31.     On April 23, DiPaola and Van Tatenhove attended a board committee meeting at which DiPaola introduced Van Tatenhove—to applause—as the "incoming dean" of the law school and dismissed accreditation concerns, arguing that "it would be a number of years before we're reviewed again by the ABA". Exs. 13–14. He also identified "financial pressures", "workforce

---

[11] *Id.*

alignment needs", "demand for new academic programs", "artificial intelligence", and "the need for external fundraising" as "extraordinary circumstances" justifying appointing a dean who would not be a tenured member of the faculty. Ex. 14. He did not attempt to explain why those circumstances precluded selection of any of the other three finalists approved by the faculty, one of whom has said that she would have accepted an offer.

32.     Van Tatenhove defended his appointment to reporters at the meeting. Ex. 13. He said that he had spoken with "faculty" earlier that day, conceded that he faced "strong disagreement" about the "best profile for the university", and said (in paraphrase) that he "plans to grow the faculty". *Id.* Despite having been ruled "unacceptable" by the faculty in their email, Van Tatenhove also said that he "could not be more honored and excited to have been accepted as dean and appointed as dean of my alma mater." *Id.* At the meeting, DiPaola apparently did not address why there might be "good cause" to appoint a dean over the stated objection of the faculty, as required by ABA Interpretation 203-1.

33.     On April 24, Capilouto defended the appointment before the full board. Ex. 15. He, too, introduced Van Tatenhove as the "next dean" of the law school. In contravention of the plain language of ABA Interpretation 203-1, he argued that (in paraphrase) "American Bar Association standards" "do not exist to give a group of faculty veto power on decisions[.]"[12] Echoing DiPaola's claim that Van Tatenhove was needed "for external fundraising", Capilouto emphasized that "alumni leaders strongly support" Van Tatenhove. Ex. 15. J. David Rosenberg, for whom the school is currently named, had earlier told reporters that Van Tatenhove would "engage" "alumni in supporting [the school's] success".[13] He attended the board meeting.

---

[12] Lily Burris, *UK Board of Trustees Discusses New Law School Dean in Meeting*, WEKU, https://www.weku.org/lexington-richmond/2026-04-24/uk-board-of-trustees-discusses-new-law-school-dean-in-meeting.

[13] McKenna Horsley et al., *Bush-Appointed Federal Judge Named as next Dean of University of Kentucky Law College • Kentucky Lantern*, Kentucky Lantern (Mar. 6, 2026), https://kentuckylantern.com/briefs/bush-appointed-federal-judge-named-as-next-dean-of-university-of-kentucky-law-college/.

34.     Capilouto and DiPaola's emphasis on Van Tatenhove's fundraising promise contrasts with Van Tatenhove's CV, which is devoid of fundraising experience. Ex. 7. Van Tatenhove spent nearly thirty years either as a government lawyer or a federal judge—roles in which fundraising is not appropriate. However, Van Tatenhove has a history of accepting gifts from Joe and Kelly Craft, who are major donors to the University. Ex. 24. In consequence, Van Tatenhove placed them on his "permanent recusal" list as federal judge. *Id.* Joe Craft is a graduate of the law school. And alumni donors appear to have worked very closely with law school deans in the past or to have attempted to influence the intellectual life of the law school. In August 2024, former interim dean Paul Salamanca told to Woodcock that a wealthy family had recently asked Salamanca to invite Thomas Chatterton Williams—a writer known for his criticism of identity politics—to campus in exchange for a potential gift to the school. Woodcock Decl. ¶ 18. Salamanca also told Woodcock that he spoke to alum and major donor J. David Rosenberg on the phone every day. *Id.*

35.     At the board meeting on April 24, the board voted to convene a working group to consider whether the University's governing regulations should be revised to allow the board to vote on dean appointments "going forward" and report back to the board at its next meeting. Ex. 15. At that next meeting, on June 30, the board directed Capilouto to revise the governing regulations to ensure that "all future Dean appointments are approved by the" board. Ex. 16. However, the board did not block the appointment of Van Tatenhove. His contract specifies his start date as July 15, 2026.

36.     The Faculty Executive Committee of the law school is a committee of the law school faculty that in the past has advised the dean on matters of faculty performance and salary. L. Fac. R. & Pol'ys § 2.A, Ex. 30. Pursuant to law faculty custom, the committee consists of four members of the law school faculty elected annually, with each member of the committee permitted to serve no more than two consecutive terms. Ex. 69. In 2025, the University appointed James C. Duff as

19

Interim Dean without, on information and belief, consulting with the faculty. Woodcock Decl. ¶ 22. Like Van Tatenhove, Duff had no academic administrative experience and had never held a full-time position as a law professor. His term ended on June 30, 2026. Ex. 63.

37.     Because the announcement of Van Tatenhove as dean immediately diluted Woodcock's message that his work is subject to peer review and indeed compelled him to send the opposite message that his work is subject to review by a non-peer, Woodcock has suffered an irreparable deprivation of constitutional rights since the announcement on March 6. Woodcock Decl. ¶¶ 12-13. Once Van Tatenhove takes office on July 15, 2026, that harm will be magnified because Van Tatenhove's power to determine Woodcock's career path will graduate from imminence to certainty, further burdening Woodcock's ability to send his message of peer review. Once Van Tatenhove takes office on July 15, the harm of the appointment will also become irreparable because the effects of the appointment cannot be unscrambled. As Michael noted, good people will leave or refuse to join the faculty and the Court will be powerless to order them to join or rejoin the faculty in the future. Ex. 36. Van Tatenhove's start as dean on July 15 will also place the University in breach of its contract with Woodcock not to violate accreditation standards. Woodcock's expectation damages are the damage done by the appointment to the peer review platform supplied to him by the University. The value of that platform is a share of the dollar value of the pay cut that Woodcock took in order to join the faculty. But the precise dollar value of that share is difficult to calculate, making that harm irreparable as well. Woodcock will also suffer harm to reputation and professional relationships, as well as mental and emotional harm, each of which is irreparable as well.

**LEGAL CLAIMS**

**Count I**

**Violation of the First Amendment Right of Expressive Association**

20

**(42 U.S.C. § 1983)**

**Against Capilouto and DiPaola**

38.     Woodcock incorporates and restates each paragraph of this Complaint.

39.     The faculty of the law school associate to convey the message that their professional advancement depends on "peer review", which is judgment of the quality of their scholarship by persons whom the faculty determine to be qualified to undertake such a task. The faculty convey this message in numerous ways, including through their decisions regarding whom to make a member of the faculty or their leader as dean, the mission statement that they publish on the law school website and in the law faculty rules, and when they declare their affiliation with the law faculty or the University of Kentucky at conferences or in publications.

40.     The appointment of Van Tatenhove as dean over the objection of the faculty significantly affects the ability of the faculty to send their message because, as both a functional and a formal matter, the dean is both a member of the faculty and the leader of the faculty. He hires, promotes, and otherwise evaluates faculty members based on the quality of their scholarship. His negative evaluation can lead to termination of a tenured appointment to the faculty. Accordingly, the hiring of Van Tatenhove as dean dilutes the message that the faculty wish to send or otherwise compels the faculty to send the opposing message that their professional advancement does not depend on the judgment of persons whom the faculty have determined are qualified to evaluate the quality of faculty scholarship.

41.     The faculty's message that their professional advancement depends on peer review is a matter of public concern because it is an element of academic freedom, which, the Supreme Court has noted, "is of transcendent value to all of us, and not merely to the teachers concerned". *Keyishian v. Board of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1966). It also operates as a certification that the work of faculty has not been distorted by outside interests, and is therefore information needed

21

for the public to make informed decisions regarding whether their public law school is being operated efficiently.

42.     The faculty do not speak for their employer when they send their message because their message is that their professional advancement is not subject to the control of their employer, at least insofar as it depends upon judgment of their scholarship. The faculty also do not speak for their employer because the message that they engage in peer review is a core academic function and specifically part of their scholarship. The certification that their message provides regarding the lack of outside influence over their work and indeed regarding the dependence of their work on the judgment of other scholars is what transforms their work from research into scholarship and is therefore inseparable from their scholarship.

43.     Woodcock's own speech is significantly affected by Van Tatenhove's appointment because Woodcock uses his affiliation with the faculty to send the message that his scholarship is subject to peer review. Woodcock suffered harm starting the moment that Van Tatenhove's appointment was announced on March 6, 2026, because, starting from that moment, he could no longer use his membership on the faculty to send the message that his work would be subject to peer review. Woodcock has uploaded several scholarly papers to public websites, and has also spoken at an academic conference, since the announcement. As a result of the imminent appointment of Van Tatenhove, he could not use his affiliation with the faculty to append the message that this work would be subject to peer review to those postings and conference statements.

44.     Capilouto and DiPaola are both personally responsible for the appointment of Van Tatenhove over the objection of the faculty. DiPaola extended the job offer to Van Tatenhove after the faculty had informed him that they objected to Van Tatenhove's candidacy. DiPaola reviewed

feedback on Van Tatenhove with Capilouto and the two men jointly made the decision to extend the offer to Van Tatenhove. Both men later separately defended the appointment to the board.

## Count II

### Conspiracy to Violate Constitutional Rights

### (42 U.S.C. § 1983)

### Against Van Tatenhove, Capilouto, and DiPaola

45.    Woodcock incorporates and restates each paragraph of this Complaint.

46.    Van Tatenhove, Capilouto, and DiPaola formed a single plan to appoint Van Tatenhove dean of the law school over the objection of the faculty in violation of Woodcock's First Amendment right to associate with the faculty to send the message that his work is subject to peer review. After learning of the faculty's objection in early February, DiPaola reviewed feedback with Capilouto and the two men decided to make an offer to Van Tatenhove to enter into an agreement to appoint him dean of the law school. Van Tatenhove accepted the agreement on or before March 3. After the faculty's objection to the appointment became public, the three men each defended Van Tatenhove's appointment at meetings of the board of trustees on April 23 and 24. Van Tatenhove also allowed himself to be introduced as the incoming dean at the board committee meeting that he attended. The faculty's objection to the appointment and the consequences of the appointment for compliance with accreditation requirements were subjects of discussion at the meetings attended by Van Tatenhove, Capilouto, and DiPaola.

47.    Each of the three men shared in the general conspiratorial objective because, in response to public outcry, each defended Van Tatenhove's appointment at meetings of the board of trustees either to the board itself or to reporters.

48.    The three men undertook numerous overt acts in furtherance of the conspiracy. Van Tatenhove signed the offer letter, attended a board meeting at which DiPaola defended his

23

appointment, met with faculty members who were opposed to his appointment, and defended his appointment to reporters at a board committee meeting. DiPaola signed the offer letter to Van Tatenhove and defended the appointment at a board meeting. Capilouto jointly decided with DiPaolo to make the offer, invited a member of the law school's visiting committee to speak in defense of the appointment at a board meeting and himself defended the appointment at the board meeting.

## Count III

### Tortious Interference with Contract

### (Employment Agreement Between Woodcock and University of Kentucky)

### Against Van Tatenhove

49.     Woodcock incorporates and restates each paragraph of this Complaint.

50.     At all times during his appointment, Woodcock had access to the University's Employee Code and other rules and regulations.

51.     The University's Employee Code binds the University to ensure that all its employees, including Capilouto and DiPaola, do not violate accreditation rules. The Employee Code is part of Woodcock's employment agreement, including for the following reasons. Woodcock's offer letter, which he and a law school dean signed, clearly refers to the University's regulations, to which the Code belongs, and describes Woodcock's position using terms that are only defined in the regulations. Woodcock asked questions about University respect for faculty governance before signing. And the Code and Woodcock's employment agreement share mutuality of subject matter because the Code governs the behavior of employees and the offer letter describes Woodcock's role and responsibilities as an employee of the University. The University's rules and regulations also constitute an express personnel policy that the University incorporates into the Faculty Handbook that it distributes, Woodcock has continued to work for the past eight years while the regulations,

24

including the Employee Code, have remained in effect, and the language used in the regulations is not precatory. Indeed, the Employee Code states that employees "must comply" with accreditation requirements. There is also no disclaimer of the legal effect of University regulations. Instead, the Faculty Handbook instructs readers to consult the regulations for information about the "rights and duties of University employees".

52.    Van Tatenhove knew or should have known about the contract. As a federal district court judge, Van Tatenhove wrote six opinions in the case of a tenured University of Kentucky professor who had been charged by the University with violating the provision of the Employee Code that mandates compliance with accreditation rules. The University's statement of charges, which cites to and paraphrases the rule, was entered into evidence in the case and Van Tatenhove wrote an opinion discussing a governing regulation and the professor's employment agreement in detail. Van Tatenhove also decided another case in which he held that a personnel policy, such as the University regulations at issue in this case, was part of an employee's contract.

53.    Van Tatenhove intended to cause the University to breach Woodcock's employment agreement. After the faculty's objection to his appointment became public, he met with faculty who opposed his appointment and attempted to have constructive conversations with them, and then attended a board meeting at which DiPaola defended the appointment and introduced him as the new dean to applause. He also defended his appointment to reporters at the meeting. He described the appointment as an honor and exciting.

54.    Van Tatenhove's conduct will imminently cause the University to breach Woodcock's contract on July 15, 2026, when Van Tatenhove starts as dean. The Employee Code binds the University to ensure that its employees abide by accreditation requirements. The ABA accredits the law school. ABA rules prohibit the appointment of a dean over the stated objection of the faculty without good cause and further prohibit the appointment of a dean without academic

25

tenure other than in extraordinary circumstances. On February 4, the faculty stated their objection to the appointment of Van Tatenhove to DiPaola. And the University has said that Van Tatenhove will not seek tenure. As AAUP guidance makes clear, in order to meet the good cause and extraordinary circumstances exceptions, the University must provide compelling reasons why the three other finalists chosen by the University and approved by the faculty were not acceptable. In their statements to the board, DiPaola and Capilouto failed to provide any reasons for which the finalists approved by the faculty, one of whom has said that she would have accepted an offer, were not acceptable. Instead, Capilouto and DiPaola's justifications amount to no more than attempts to explain why Van Tatenhove's lack of a scholarly record and academic administrative experience should not immediately disqualify him. Accordingly, Van Tatenhove will take office on July 15, 2026, in violation of accreditation requirements and hence in violation of the Employee Code and Woodcock's contract.

55.    Woodcock bargained for the University to abide by accreditation requirements—such as the rules that deans not be appointed over the objection of the faculty and that they be tenured faculty members—that ensure that his professional advancement depends on the judgment of his scholarship by people determined by the faculty to be qualified to render such judgments. Adherence to these requirements, and the certification of lack of outside influence over his scholarship that they constitute, gives Woodcock a valuable public platform for his scholarship. Woodcock bargained for this consideration in exchange for taking a massive pay cut in relation to what he could be earning today in a career as a corporate lawyer in industry or in relation to the appointment in the business school at Georgia State (where university administrators did not respect faculty judgments regarding scholarship) that he left in order to come to University of Kentucky. Van Tatenhove's appointment diminished the value of the platform provided Woodcock by the University the moment that the appointment was announced. From that time on, Woodcock's

scholarship was subject to the future judgment of a dean whom the faculty had determined not to be qualified to judge his work, suggesting the potential for influence by a non-scholar over his conclusions. This deprived Woodcock of the benefit of his bargain and will continue to do so.

56.     Van Tatenhove acted without justification. Woodcock's contract does not accord him the right to waive accreditation requirements and the interference has not taken the form of litigation in which Van Tatenhove was the prevailing party. He has professed to act out of a desire for honor and excitement. He also stands to gain a $442,000 annual salary and a $1.3 million golden parachute in addition to his $249,000 annual federal pension. The desire for wealth and honor do not justify interference with contract.

### PRAYER FOR RELIEF

WHEREFORE, Woodcock respectfully requests:

- An injunction prohibiting the University of Kentucky, Capilouto, and DiPaola from appointing or maintaining Van Tatenhove as dean of the law school or according him any of the rights, privileges, powers, or immunities of dean;

- An injunction prohibiting Van Tatenhove from assuming or continuing in the position of dean of the law school or exercising, accepting, or assuming any of the rights, privileges, powers, or immunities of dean;

- An injunction appointing the Faculty Executive Committee of the law school to the position of dean or otherwise according to the Faculty Executive Committee all of the rights, duties, privileges, powers, liabilities, and immunities of dean and ensuring the enforcement and effectiveness thereof until such time as the University appoints a new permanent (i.e., non-interim) dean of the law school;

27

- An injunction prohibiting the University of Kentucky, Capilouto, and DiPaola from appointing or reappointing a dean or interim dean of the law school over the objection of a majority of the faculty as defined in Section E.3.a. of the version of the University's Administrative Regulation — University Organization that was in force when this lawsuit was filed;

- A preliminary injunction granting the above relief throughout the pendency of this case and a temporary restraining order granting the above relief until the Court resolves the preliminary injunction;

- An injunction directing the University of Kentucky, Capilouto, and DiPaola to comply with the written rules, regulations, and policies of the University, including the Governing Regulations, Administrative Regulations, Faculty Handbook, and law school Faculty Rules;

- An injunction directing the University of Kentucky, Capilouto, and DiPaola to comply with the University's Employee Code and the rules, standards, and interpretations for the approval of law schools promulgated by the American Bar Association;

- Declarations under 28 U.S.C. § 2201 that the appointment of Van Tatenhove would breach the University's employment contract with Woodcock;

- A declaration under 28 U.S.C. § 2201 that Van Tatenhove tortiously interfered with the University's employment contract with Woodcock;

- Declarations under 28 U.S.C. § 2201 that the University's contract to appoint Van Tatenhove dean of the law school violates Woodcock's First Amendment right to expressive association and that Van Tatenhove's start as dean would violate Woodcock's First Amendment right to expressive association;

28

- Monetary damages against Van Tatenhove for tortious interference, including but not limited to attorney fees, expert witness fees, and costs associated with preparations for litigating the University's imminent breach of its contract with Woodcock, direct and indirect economic losses, lost expectancy, lost profits, expenses, reputational harm, harm to professional relationships, mental anguish, emotional distress, nominal damages, and punitive damages;

- Monetary damages against Van Tatenhove, Capilouto, and DiPaola for violation of Woodcock's First Amendment rights, including attorney fees, expert witness fees, and costs under 42 U.S.C. § 1988, direct or indirect economic losses, lost expectancy, lost profits, expenses, reputational harm, harm to professional relationships, mental anguish, emotional distress, nominal damages, and punitive damages;

- Pre- and post-judgment interest; and

- Such other relief as law and justice allow.

### REQUEST FOR TRIAL BY JURY

Woodcock hereby requests a trial by jury with respect to any issues so triable.

WHEREFORE, Woodcock prays that this Court grant declaratory and injunctive relief against Defendants, and award him damages in an amount commensurate with his damages, punitive damages, interest as allowed by law, and all other relief just and proper in the premises.

To this Court most humbly submitted,

*/s/ Rima N. Kapitan* (to be admitted *pro hac vice*)

/s/ Joe F. Childers
Joe F. Childers
JOE F. CHILDERS & ASSOCIATES
The Lexington Building

201 West Short Street
Suite 300
Lexington, Kentucky 40507
Phone: 859-253-9824
Joe@Jchilderslaw.com

**Kapitan Gomaa Law, P.C.**
Rima Kapitan (IL Atty No. 6286541)
P.O. Box 46503
Chicago, IL 60646
(312) 566-9590
rima@kapitangomaa.com

30

## VERIFICATION AND DECLARATION

I, Ramsi A Woodcock, verify and declare that I have reviewed the foregoing Complaint and that the facutal allegations are true and correct to the best of my personal knowledge and belief, and based on investigation and information received to date.

DATED: July 13, 2026

/s/ *Ramsi A. Woodcock*
**Ramsi A. Woodcock**

**EXHIBIT LIST**

Exhibit 1: Announcement of Candidate A's Visit

Exhibit 2: Announcement of Candidate D's Visit

Exhibit 3: Dean Job Posting

Exhibit 4: Leary CV

Exhibit 5: Higdon CV

Exhibit 6: Sterio CV

Exhibit 7: Van Tatenhove CV

Exhibit 8: Faculty Email Rejecting Van Tatenhove

Exhibit 9: Faculty Email Regarding 2025 Dean Candidates

Exhibit 10: George Wright Biography

Exhibit 11: Van Tatenhove Offer Letter

Exhibit 12: Beshear Facebook Post

Exhibit 13: Courier Journal Article 4/23/26

Exhibit 14: Board Committee Minutes 4/23/26

Exhibit 15: Board Minutes 4/24/26

Exhibit 16: Board ECR 3 6/30/26

Exhibit 17: Provost's Announcement of Van Tatenhove 3/6/26

Exhibit 18: University Mission Statement

Exhibit 19: ABA Standards Chapter 2

Exhibit 20: AR Employee Code

Exhibit 21: Woodcock Offer Letter

Exhibit 22: AR University Organization

1

Exhibit 23: AR 3:10 Performance Review

Exhibit 24: Herald Leader Article 4/24/26 (Reality Check)

Exhibit 25: Andy Barr Press Release

Exhibit 26: GR I Declaration of Principles

Exhibit 27: 1915 Declaration (AAUP)

Exhibit 28: Leary Email

Exhibit 29: Faculty Mission Statement

Exhibit 30: Faculty Rules

Exhibit 31: 1967 Statement (AAUP)

Exhibit 32: 2006 Statement (AAUP)

Exhibit 33: Asterisk Footnotes

Exhibit 34: SSRN Posts

Exhibit 35: AR 7:6 Intellectual Property

Exhibit 36: Michael Email

Exhibit 37: GR III The President

Exhibit 38: AR 2:2-1 Appointment, Reappointment, Promotion, and the Granting of Tenure in the
Regular Title Series

Exhibit 39: AR 2:1-1 Procedures for Faculty Appointment, Reappointment, Promotion and the
Granting of Tenure

Exhibit 40: Faculty Handbook Preface

Exhibit 41: Governing Regulation, Part XIV Ethical Principles and Code of Conduct

Exhibit 42: Cunningham Charges

Exhibit 43: Herald Leader Article 4/24/26 (Tight Budget)

Exhibit 44: In-House Compensation Survey

2

Exhibit 45: Woodcock Salary Letter

Exhibit 46: Woodcock CV

Exhibit 47: Beshear X Post

Exhibit 48: Woodcock NOA

Exhibit 49: Judicial Compensation

Exhibit 50: Van Tatenhove DOJ CV

Exhibit 51: Courier Journal 4-21-26

Exhibit 52: Duff Testimony

Exhibit 53: Capilouto Employment Agreement

Exhibit 54: Duff Bios

Exhibit 55: Faculty Email Requesting Update on 2025 Search

Exhibit 56: Provost 2025 Call for Nominations for Interim Dean

Exhibit 57: Kentucky Lantern Article 2/22/26

Exhibit 58: ABA Complaint Process Outline

Exhibit 59: ABA Complaint

Exhibit 60: ABA Complaint Determination Letter

Exhibit 61: Complaint to Board

Exhibit 62: Complaint to President

Exhibit 63: Duff Offer Letter

Exhibit 64: Salamanca Offer Letter

Exhibit 65: Davis Offer Letter

Exhibit 66: AR 1:1 University of Kentucky Administrative Organization

Exhibit 67: Chronicle of Higher Education Article 9/19/24

Exhibit 68: Kentucky Lantern Article 8/26/25

Exhibit 69: Executive Committee Election Email

Exhibit 70: ABA's 2023 Notice of Noncompliance

Exhibit 71: ABA's 2023 Notice of Compliance

Exhibit 72: 1981 Statement (AAUP)