**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

Ramsi A. Woodcock,

*Plaintiff*,

Case No. [＿＿＿＿＿]

v.

**ORAL HEARING REQUESTED**

Gregory Van Tatenhove et al.,

*Defendants*.

**WOODCOCK'S MOTION FOR A TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY**

**TABLE OF CONTENTS**

Introduction ........................................................................................................................1

Factual Background ...........................................................................................................3

Argument............................................................................................................................5

   A.     Woodcock Has a Strong Likelihood of Success on the Merits ...........................................5

    1.     Woodcock Has a Strong Likelihood of Success on His Section 1983 Claims Against All Defendants ...........................................................................................................................5

       a)     The University Defendants Have Violated Woodcock's Right of Expressive Association ..........................................................................................................................6

         (1)    The Law Faculty Are an Expressive Association ......................................................6

         (2)    The Faculty Associate to Send the Message That Their Work Is Subject to Peer Review   7

         (3)    Forcing the Faculty to Accept a Leader That the Faculty Has Judged Unqualified Significantly Affects the Faculty's Ability to Convey The Message That They Are Subject to Peer Review...........................................................................................11

         (4)    The Public Concern and Employee Speech Tests Are a Poor Fit in a Case Involving the Compelled Speech of a Broad Category of Employees and, in Any Case, the Tests Are Satisfied Because the Faculty's Claim to Autonomy Is a Matter of Public Concern and Is Either Protected Scholarly Speech or Private Citizen Speech ....................12

         (5)    The Government Has No Countervailing Interest in Imposing a Dean Whom the Law Faculty Reject...........................................................................................................14

b)    Van Tatenhove Conspired with the University Defendants to Deprive Woodcock of His Right to Expressive Association ........................................................................................16

2.    Woodcock Has a Strong Likelihood of Success on His Tortious Interference with Contract Claim Against Van Tatenhove ............................................................................17

B.    The Appointment of Van Tatenhove Irreparably Harms Woodcock ..............................23

C.    The Public Interest and Lack of Harm to Others Favor Grant of the Motion...............24

Conclusion ...........................................................................................................................................25

# TABLE OF AUTHORITIES

***Cases***

*Anyconnect (US) v. Williamsburg Place, LLC,*
    636 S.W.3d 556 (Ky. Ct. App. 2021) ........................................................................24

*Basicomputer Corp. v. Scott,*
    973 F.2d 507 (6th Cir. 1992) ...................................................................................23

*Bays v. City of Fairborn,*
    668 F.3d 814 (6th Cir. 2012) ...............................................................................23, 25

*Belden Corp. v. InterNorth, Inc.,*
    90 Ill. App. 3d 547 (1980) ......................................................................................20

*Blair v. General Motors Corp.,*
    838 F. Supp. 1196 (W.D. Ky. 1993) ........................................................................23

*Blick v. Ann Arbor Public School Dist.,*
    105 F.4th 868 (6th Cir. 2024) ................................................................................ 6, 5

*Boy Scouts of America v. Dale, the Supreme Court,*
    530 U.S. 652 (2000) ........................................................................................*passim*

*Britt v. University of Louisville,*
    628 S.W.3d 1 (Ky. 2021) .........................................................................................18

*Burt v. Rumsfeld,*
    354 F. Supp. 2d 156 (D. Conn. 2005) .......................................................................7

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.,*
    511 F.3d 535 (6th Cir. 2007) ...................................................................................25

*Chappel v. Montgomery County Fire Protection,*
    131 F.3d 564 (6th Cir. 1997) ...................................................................................13

*Crenshaw v. Erskine College,*
    850 S.E.2d 1 (S.C. 2020) .........................................................................................18

*Cunningham v. Blackwell,*
    568 F. Supp. 3d 799 (E.D. Ky. 2021) .......................................................................19

*DeCrane v. Eckart,*
    12 F.4th 586 (6th Cir. 2021) ....................................................................................13

*Elrod v. Burns*,
    427 U.S. 347 (1976)................................................................................................23

*Epps Chevrolet Co. v. Nissan North America, Inc.*,
    99 F. Supp. 3d 692 (E.D. Ky. 2015)........................................................................17

*Eu v. San Francisco County Democratic Central Comm.*,
    489 U.S. 214 (1988)............................................................................................ 5, 12

*FAIR v. Rumsfeld*,
    390 F.3d 219; 291 F. Supp. 2d 269 (3d Cir. 2003)................................................ 1, 7

*Farhat v. Jopke*,
    370 F.3d 580 (6th Cir. 2004)...................................................................................13

*Federal Trade Commission v. HJ Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ...........................................................................24, 25

*Frontiero v. Richardson*,
    411 U.S. 677 (1973).................................................................................................15

*Gray v. Board of Higher Educ., City of New York*,
    692 F.2d 901 (2d Cir. 1982) ....................................................................................10

*Greene v. Howard University*,
    412 F.2d 1128 (D.C. Cir. 1969) ...............................................................................10

*Hardy v. Jefferson Community College*,
    260 F.3d 671 (6th Cir. 2001)....................................................................................14

*Harrodsburg Indus. Warehousing v. Migs, LLC*,
    182 S.W.3d 529 (Ky. Ct. App. 2005) .................................................................. 21, 23

*Huntington Branch, NAACP v. Town of Huntington*,
    689 F.2d 391 (2d Cir. 1982) .......................................................................................6

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*,
    515 U.S. 557 (1995)....................................................................................................7

*Janus v. American Federation of State, County, and Municipal Employees, Council 31*,
    585 U.S. 878 (2018)...................................................................................2, 12, 14, 15

*Kentucky v. Whitworth*,
    74 S.W.3d 695 (Ky. 2002) .........................................................................................16

*Keyishian v. Board of Regents of Univ. of State of NY*,
    385 U.S. 589 (1966)...................................................................................................13

v

*Kiser v. Reitz,*
        765 F.3d 601 (6th Cir. 2014) ..................................................................................... 5

*Knight Enterprises, Inc. v. RPF Oil, Co.,*
        829 N.W.2d 345 (Mich. Ct. App. 2013) ............................................................... 19, 20

*Lynch v. Ackley,*
        811 F.3d 569 (2d Cir. 2016) ................................................................................... 12

*Mathis v. Liu,*
        276 F.3d 1027 (8th Cir. 2002) ................................................................................. 22

*Mayberry v. Dees,*
        663 F.2d 502 (4th Cir. 1981) ................................................................................... 10

*McGirr v. Rehme,*
        891 F.3d 603 (6th Cir. 2018) .................................................................................... 5

*Meriwether v. Hartop,*
        992 F.3d 492 (6th Cir. 2021) ................................................................................... 14

*Midwest Guaranty Bank v. Guaranty Bank,*
        270 F. Supp. 2d 900 (E.D. Mich. 2003) .................................................................. 25

*Myers v. City of Centerville, Ohio,*
        41 F.4th 746 (6th Cir. 2022) ................................................................................... 14

*National Coll. Athletic Ass'n v. Hornung,*
        754 S.W.2d 855 (Ky. 1988) ................................................................................. 19, 22

*NLRB v. Yeshiva Univ.,*
        444 U.S. 672 (1979) ................................................................................................. 6

*Outfront Media, LLC v. LeMaster,*
        399 F. Supp. 3d 671 (E.D. Ky. 2019) ..................................................................... 19

*Overstreet v. Lexington-Fayette Urban County Gov't,*
        305 F.3d 566 (6th Cir. 2002) ................................................................................... 23

*Parts Depot, Inc. v. Beiswenger,*
        170 S.W.3d 354 (Ky. 2005) ................................................................................. 18, 19

*Regents of Univ. of Mich. v. Ewing,*
        474 U.S. 214 (1985) ............................................................................................. 10, 13

*Rodgers v. Banks,*
        344 F.3d 587 (6th Cir. 2003) ................................................................................... 13

vi

*Rose v. Stephens*,
    291 F.3d 917 (6th Cir. 2002).................................................................................15

*Rudd v. City of Norton Shores, Michigan*,
    977 F.3d 503 (6th Cir. 2020)............................................................................ 5, 16

*Rumsfeld v. FAIR*,
    547 U.S. 47 (2005)...................................................................................................7

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976)...................................................................................................5

*Slattery v. Hochul*,
    61 F.4th 278 (2d Cir. 2023)....................................................................................8

*Tele-Port, Inc. v. Ameritech Mobile Communications*,
    49 F. Supp. 2d 1089 (E.D. Wis. 1999)..............................................................18

*United States v. Kozminski*,
    487 U.S. 931 (1988)...............................................................................................24

*University of Kentucky v. Regard*,
    670 S.W.3d 903 (Ky. 2023) .................................................................................18

*Ventas, Inc. v. HCP, Inc.*,
    647 F.3d 291 (6th Cir. 2011)...............................................................................19

*Widmar v. Vincent*,
    454 U.S. 263 (1981)...............................................................................................10

**Constitutional Provisions**

U.S. Const. amend. I..........................................................................................*passim*

**Statutes**

Ky. Rev. Stat. 164.230(5)..........................................................................................1

**Federal Rules**

Fed. R. Civ. P. 26(f) ...................................................................................................3

Fed. R. Civ. P. 65(b)(2)..............................................................................................3

**Other Authorities**

Matthew W. Finkin et al., *For the Common Good* (Yale 2011) .................................8

Immanuel Kant, *The Conflict of the Faculties* (Mary J. Gregor trans., Nebraska 1992) (1798)....................9

Restatement (Second) of Torts § 766 ..............................................................................................19

Restatement (Second) of Torts § 766 cmt. s.................................................................................19

Restatement (Second) of Torts § 767 cmt. e.................................................................................23

Restatement (Third) of Agency § 3.10(1) ......................................................................................13

William E. Thro et al., *The Constitution on Campus* (Bloomsbury 2022).....................................24

**INTRODUCTION**

Members of university faculties associate to send the message that their research is trustworthy because their prospects for employment and promotion depend upon the testing of their work by persons whom the faculty consider competent to render such tests—a process known as "peer review". 1915 Decl., Ex. 27 at 294. On July 15, 2026, the University of Kentucky will appoint Defendant Gregory Van Tatenhove dean of the Rosenberg College of Law ("law school") over the objection of the faculty, who have judged him "unacceptable" due to his lack of a scholarly record or academic leadership experience. Fac. Email 2/4/26, Ex. 8 at 1–2. As dean, he will have the authority to make evaluations of the scholarship of faculty that can lead to termination of a tenured appointment. AR 3:10 Perf. Rev. § A.1, Ex. 23 at 2; AR Org. §§ F.2.c, F.2.e, Ex. 22 at 13, 15 (according deans the responsibilities of department chairs in colleges lacking departments); Ky. Rev. Stat. § 164.230(5) (providing for removal of tenured faculty based on performance).

Plaintiff Ramsi Woodcock is a tenured professor at the law school. The appointment of Van Tatenhove violates Woodcock's First Amendment right to expressive association. Because "law faculties" "qualify as expressive associations" even when acting without "the blessings of their . . . parent institutions", their members have a First Amendment right to decide who can be a faculty member and who can lead the faculty as dean. *Boy Scouts v. Dale*, 530 U.S. 640, 653 (2000); *FAIR v. Rumsfeld*, 390 F. 3d 219, 231 (3d Cir. 2004); *FAIR v. Rumsfeld*, 291 F. Supp. 2d 269, 286, 289–90, 304 (D.N.J. 2003). When Defendant Eli Capilouto, who is President of the University, and Defendant Robert DiPaola, who is Provost (collectively, "University Defendants"), conspire with Van Tatenhove to impose a leader on the faculty whom the faculty do not want, they "compel" the faculty to send a new message that "derogate[s]" from the "expressive message" that the faculty wish to send. *Dale*, 530 U.S. at 661. The new message is that faculty members' prospects for employment and promotion depend on the judgment of a person whom they have determined is not qualified to review their work.

1

Because "[f]orced associations that burden protected speech are impermissible", the appointment violates the First Amendment unless Defendants can show, at a minimum, that the faculty's desired message of peer review prevents the "effective functioning" of the University. *Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 585 U.S. 878, 892, 947 (2018) (Kagan, J., dissenting). But the mission of the University is to "[e]xpand[] knowledge through . . . scholarship", and peer review is what distinguishes scholarship from research reports generated by business or advocacy organizations. Univ. Mission, Ex. 18 at 3; 1915 Decl., Ex. 27 at 293. So the faculty's message advances the University's mission instead of disrupting it. The University therefore cannot meet its burden. In pursuing appointment as dean, Van Tatenhove also interferes with the University's contractual duty to Woodcock to comply with law school accreditation standards that guarantee peer review, including a rule that requires that a dean not be selected over the objection of the faculty without "good cause". ABA Standards Interp. 203-1, Ex. 19 at 14; Employee Code § I.D, Ex. 20 at 1.

On June 30, 2026, the University's Board of Trustees ("board") met for the final time before the appointment goes into effect on July 15, 2026. The board omitted to direct the University Defendants to rescind the appointment. Woodcock respectfully requests that the Court issue a temporary restraining order and preliminary injunction barring Van Tatenhove from assuming, and the University Defendants from appointing him to, the deanship of the law school. Because in 2025, without obtaining faculty consent, University Defendants appointed an interim dean who, like Van Tatenhove, had no experience as an academic administrator or full-time law professor, Woodcock further requests that this Court order the University Defendants to place the powers of the dean's office in the hands of the law faculty's Executive Committee until such time as the University Defendants appoint a dean approved by the faculty. Because Van Tatenhove will start as dean on July 15, 2026, Woodcock respectfully asks this Court to grant his motion for a temporary restraining order **before July 15, 2026**. Woodcock further requests that, in aid of this Court's decisionmaking regarding his motion for a

2

preliminary injunction, this Court enter an order permitting discovery to begin immediately and in the absence of a Fed. R. Civ. P. 26(f) conference. Finally, Woodcock requests that, pursuant to Fed. R. Civ. P. 65(b)(2) and in light of his provision of notice to Defendants, this Court extend the temporary restraining order beyond 14 days as necessary to preserve the status quo until this Court has ruled on the preliminary injunction motion.

## FACTUAL BACKGROUND

Between January 16 and February 3, 2026, DiPaola brought four finalists for the position of dean of the law school to campus to participate in open fora with the University community. Cand. A Visit Announc., Ex. 1 at 2; Cand. D Visit Announc., Ex. 2 at 2. The University had advertised the position as "[r]equir[ing] . . . academic administrative leadership experience[.]" Job Listing, Ex. 3 at 1. Three of the finalists were tenured law professors with academic administrative experience. Leary CV, Ex. 4; Higdon CV Ex. 5; Sterio CV Ex. 6. The fourth was Van Tatenhove, whose only scholarly publication was his student note, had never held a full-time faculty role at a law school, and had no academic administrative experience. Van Tatenhove CV, Ex. 7 at 1–4.

On February 4, the faculty sent an email to DiPaola, copying Senior Adviser to the President George Wright, declaring that the faculty approved of three of the finalists. Fac. Email 2/4/26, Ex. 8 at 1; Woodcock Decl. ¶ 26. With respect to the fourth, the email expressed the "collective view[] of the faculty" that Van Tatenhove was "unacceptable to be our next Dean" because he lacks "academic administrative leadership experience" or a "record of scholarship[]" sufficient "to be granted tenure" "such that [his] appointment would fail to satisfy [American Bar Association ("ABA") standard for law school accreditation] 203(b), which calls for the Dean of a law school to be appointed as a member of the faculty with tenure." *Id.* at 2; ABA Standards § 203(b), Ex. 19 at 2. ABA accreditation standards also prohibit the "appoint[ment]" of a dean "over the stated objection of a substantial majority of the faculty" "[e]xcept for good cause". *Id.* at Interp. 203-1. And University regulations that are part of

3

Woodcock's employment contract mandate "personal and institutional responsibility and accountability" for "compl[iance] with . . . accreditation requirements." GR I Decl. Princip. § E, Ex. 26 at 4; Employee Code § D, Ex. 20 at 1; Woodcock Offer Ltr., Ex. 21 at 1.

DiPaolo did not make an offer to any of the three finalists approved by the faculty, at least one of whom would have accepted. Leary Email, Ex. 28 at 1; Complaint ¶ 15. Instead, on February 27, DiPaola made an offer to Van Tatenhove to become the next dean of the law school starting July 15, 2026. Offer Ltr., Ex. 11 at 1. Van Tatenhove accepted on or before March 3 and DiPaola announced the appointment on March 6. *Id.* at 4; Announc., Ex. 17 at 1 (misstating the effective date as July 1, 2026).

On April 21, Kentucky Governor Andy Beshear expressed "concern[]" on Facebook that "the new dean of law was the only candidate not recommended by law school faculty". Facebook Post, Ex. 12 at 1. He urged the University community to "ask" "tough questions" at the next board meeting. *Id.* On April 23, DiPaola and Van Tatenhove attended a board committee meeting at which DiPaola defended the appointment. Courier J. 4/24/26, Ex. 13 at 1–3. Van Tatenhove allowed DiPaola to introduce him as incoming dean at the meeting, and then Van Tatenhove defended his appointment to reporters. *Id.*; Comm. Min. Ex. 14 at 7. The following day, Capilouto defended the appointment to the board. Bd. Min. 4/24/26, Ex. 15 at 3–4. The board voted to convene a working group to consider whether the University's governing regulations should be revised to allow the board to vote on dean appointments "going forward" and report back to the board at its next meeting. *Id.* at 4–5. At that next meeting, on June 30, the board directed Capilouto to revise the governing regulations to ensure that "all future Dean appointments are approved by the" board. Bd. Action, Ex. 16 at 1. However, the board did not block the appointment of Van Tatenhove. *Id.* Woodcock then brought this action.

4

**ARGUMENT**

Woodcock is entitled to a temporary restraining order and a preliminary injunction if he can make a "clear showing" that a balancing of the following four factors weighs in his favor: (1) he has a strong likelihood of success on the merits; (2) he would otherwise suffer irreparable injury; (3) there would not be substantial harm to others; and (4) the public interest would be served. *PCC Airfoils, LLC v. Daugherty*, No. 25-3794 slip op. at 3 (6th Cir. May 19, 2026); *McGirr v. Rehme*, 891 F. 3d 603, 610 (6th Cir. 2018). Woodcock makes such a showing on his Section 1983 First Amendment expressive association and conspiracy claims against all defendants and on his tortious interference with contract claim against Van Tatenhove.

**A. Woodcock Has a Strong Likelihood of Success on the Merits**

**1. Woodcock Has a Strong Likelihood of Success on His Section 1983 Claims Against All Defendants**

To establish liability under Section 1983, Woodcock must show that each defendant (1) deprived him of a constitutional right (2) under color of state law or (3) conspired with those who did so. *Rudd v. City of Norton Shores, Michigan*, 977 F. 3d 503 (6th Cir. 2020).[1] Woodcock has a strong likelihood of establishing these elements at trial.

---

[1] Woodcock has standing. Standing requires injury in fact, causation, and redressability. *Kiser v. Reitz*, 765 F. 3d 601, 607 (6th Cir. 2014). Injury in fact exists when (1) a legally protected interest has been invaded and the injury is both (2) concrete and (3) particularized and (4) actual or imminent rather than conjectural or hypothetical. *Id.* The University has invaded a legally protected interest. Woodcock has a right to associate with faculty to convey the message that his work is peer reviewed. *Dale*, 530 U.S. at 647–48. Defendants are invading that right by "forcing" the faculty to accept a "leader" whom they believe not to be a peer. *Id.*; *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 229–30 (1988). The injury is concrete and particularized. The First Amendment protects expressive association because "[c]ollaboration" with others is an "activit[y]" that is "useful for speaking". *Blick v. Ann Arbor Public School Dist.*, 105 F. 4th 868, 882 (6th Cir. 2024). Woodcock leverages his membership in the faculty to send the message that his work is peer reviewed. Woodcock Decl. ¶ 3. Diluting the faculty's message of peer review or compelling the faculty to send the opposite message by admitting a non-peer leader prevents Woodcock from leveraging his association with the faculty to send his desired message about his own work. The injury is also actual. University Defendants significantly affected Woodcock's speech as soon as they announced the appointment of Van Tatenhove as dean on March 6, because the announcement made clear that Woodcock's *current* scholarly speech would be subject to review by a non-peer. Woodcock Decl. ¶¶ 10, 13. There is causation because the burden that Defendants place on Woodcock's speech can

**a)  The University Defendants Have Violated Woodcock's Right of Expressive Association**

There is a violation of the First Amendment right to expressive association if (1) the members of a group "associate partly to express a message", (2) state action "significantly burden[s] the group's ability to spread its message" and (3) "this burden on speech outweigh[s] any governmental interests justifying the burden". *Blick v. Ann Arbor Public School Dist.*, 105 F. 4th 868, 882 (6th Cir. 2024).

**(1)  The Law Faculty Are an Expressive Association**

The Supreme Court recognizes a right to (1) "associate with others" (2) "in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Dale*, 530 U.S. at 647. The faculty of the law school associate. "The First Amendment's protection of expressive association is not reserved for advocacy groups." *Id.* at 648. The faculty as an associational unit long predates the advent of central university administrations. "At early universities, the faculty were the school" and "traditions of collegiality continue to play a significant role at many universities, including" University of Kentucky. *NLRB v. Yeshiva Univ.*, 444 U.S. 672, 680 (1979). The faculty of the law school "establish [their] own rules" and make "recommendations" regarding who may be granted "membership" in the faculty that have not been contravened by the University administration for at least half a century. AR Org. §§ E.3.a, E.3.b, F.2.c, Ex. 22 at 5–6, 12; Ausness Decl. The law faculty not only associate, but pursue educational ends. The faculty's rules declare that the faculty must "advance[e]" "legal knowledge" through "scholarship and research." Fac. R. § 13.B, Ex. 30 at 22. That is an educational end.

---

"fairly can be traced to the challenged action of the defendant[s]", namely, their insistence on appointing a dean that the faculty has determined is not a peer. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976). And there is redressability. Rescinding the appointment and enjoining the University Defendants to choose a dean approved by the faculty is "reasonably designed" to restore Woodcock's ability to convey the message that his speech is subject to peer review, thereby "avoid[ing] the specific injury alleged." *NAACP v. Town of Huntington*, 689 F.2d 391, 394 (2d Cir. 1982).

Other courts have recognized that law faculties are expressive associations. In *FAIR v. Rumsfeld*, the court held that there was "no doubt" that "law schools and law faculties", including those that are "components of a larger parent university", "qualify as expressive associations entitled to constitutional protection" even when acting without "the blessings of their . . . parent institutions". *Rumsfeld*, 291 F. Supp. 2d at 286, 289–90, 304; *see also Burt v. Rumsfeld*, 322 F. Supp. 2d 189, 197–98 (D. Conn. 2004). The Third Circuit agreed that "because" these groups "possess clear educational philosophies, missions and goals . . . they qualify as expressive associations." *Rumsfeld*, 390 F. 3d at 231 (cleaned up). The Supreme Court left that holding untouched and reversed on other grounds. *Rumsfeld v. FAIR*, 547 U.S. 47, 64 (2005). Similarly, in *Burt v. Rumsfeld*, the district court held that the Yale Law School faculty was "clearly an expressive association for the purposes of First Amendment analysis" 354 F. Supp. 2d 156, 185 (D. Conn. 2005).

**(2) The Faculty Associate to Send the Message That Their Work Is Subject to Peer Review**

To enjoy protection, an expressive association must have a "public or private viewpoint[]." *Dale*, 530 U.S. at 650. However, "[t]he fact that" a group "does not trumpet its views from the housetops . . . does not mean that its views receive no First Amendment protection." *Id.* at 656. A message that is not "exact" or "particularized", or which "is not wholly articulate", is also protected. *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 569, 574 (1995).

The faculty associate to send the message that they control their professional advancement based on their judgment of faculty scholarship. That is, they associate to declare that they are subject to "peer review" in the sense of professional self-regulation. The faculty make this claim when they state that, "[a]s scholars, we engage in robust exploration and dissemination of ideas" and that they have "an obligation" to "advanc[e]" "legal knowledge" through "scholarship." Fac. Mission, Ex. 29 at 3; Fac. R. § 13.B, Ex. 30 at 22. According to the American Association of University Professors' (AAUP's) 1915 Declaration of Principles, which is recognized as "[t]he first systematic" and

7

"arguably the greatest" "articulation of the logic and structure" of academic independence in America, whenever a faculty declares that its "purpose is" "to advance knowledge", it seeks to convey the message to the public that the scholarship and teaching of its members has or will be "tested" by people "trained for, and dedicated to, the quest for truth" rather than by "the opinions or prejudices of men who have not been set apart or expressly trained for the scholar's duties." Matthew W. Finkin et al., *For the Common Good* 30 (Yale 2011); 1915 Decl., Ex. 27 at 294–95, 300. The message that a faculty is "tested" by people "trained for, and dedicated to, the quest for truth" distinguishes a faculty associated with a university from mere groups of experts—such as those employed by thinktanks or advocacy organizations—convened "for the propagation of specific doctrines prescribed by those who have furnished its endowment" rather than for the purpose of "[g]enuine boldness and thoroughness of inquiry." *Id.* at 292–93.[2]

Indeed, this claim to peer review is the basic value proposition of any group that, like the law faculty, purports to advance knowledge. "The lay public is under no compulsion to accept or to act upon the opinions of the scientific experts whom, through the universities, it employs" except "to the extent" that the "conclusions" of those experts are "motiv[ated]" by "a desire for the respect of their fellow experts". 1915 Decl., Ex. 27 at 294. To the extent that the conclusions of faculty experts are instead "echoes of the opinions of the lay public, or of the individuals who endow or manage universities", the "proper influence" of a faculty "upon public opinion is diminished and vitiated[,] and society at large fails to get from its scholars" "the service which it is the office of the professional scholar to furnish." *Id.* at 294–95. "In the case of our state universities [it] is self-

---

[2] Because the views of researchers at thinktanks or advocacy organizations are governed by their employers, researchers in these positions may form an expressive association *with their employers* to send their *employer's* message. *See, e.g.*, *Slattery v. Hochul*, 61 F. 4th 278, 284, 287 (2d Cir. 2023). But researchers in these positions do not associate with each other to send a message independent of their employer's message. In the university context, the relationship is flipped. Faculty employees associate with each other specifically to assert that their views are independent of those of the university that employs them and the university does not associate with faculty in order to send a message of its own.

evident" that they "[c]annot be permitted to assume" such a "proprietary attitude and privilege" because they "constitute[] a public trust[.]" *Id.* at 293.

The faculty also make the claim to peer review when they advertise that the law school "has been approved by the American Bar Association since 1925[.]" ABA standards provide that the faculty must control the hiring and promotion of faculty, including the leader of the faculty, who is the dean. Specifically, ABA rules provide that, extraordinary circumstances aside, the dean of the law school must be a tenured member of the faculty, that "[t]he dean and the faculty shall recommend the selection, retention, promotion, and tenure (or granting of security of position) of members of the faculty", and that, except for good cause, a dean should not be appointed over the objection of the faculty. ABA Standards 201(b), 203(b), Interp. 203-1, Ex. 19 at 13–14. Finally, the faculty's rejection of Van Tatenhove also sent the message of peer review because the faculty rejected him based on his lack of a scholarly record. Fac. Email 2/4/26, Ex. 8 at 2. Because, as dean, Van Tatenhove would pass judgment on faculty scholarship, the faculty's rejection of his candidacy expressed the viewpoint that, as Immanuel Kant once put it, "only scholars can pass judgment on scholars as such". *The Conflict of the Faculties* 23 (Mary J. Gregor trans., Nebraska 1992) (1798); AR 3:10 Perf. Rev. § A.1, Ex. 23 at 2.

The claim to peer review made by the law faculty is reflected in the University's own policies, Supreme Court jurisprudence, and additional AAUP statements. The University's administrative regulations "charge" the law faculty, including its dean, as "member[] of the faculty", "chair of the college faculty and an ex officio member of all college committees", with "overseeing" "appointment", "salary", "tenure", and "promotion" of faculty at the college of law. AR Organization §§ E.3.a, E.3.c, E.5.c, F.2.c, Ex. 22 at 5–7, 9, 12. And the faculty rules, which are approved by the Provost, make clear that "all initial appointments" to the faculty, including the appointment of a new dean to the faculty, "are made after the Regular faculty has been consulted

9

and [has] collectively made a recommendation[.]" Fac. R. § 14.B, Ex. 30 at 26; AR Org. § E.3.b, Ex. 22 at 6. In keeping with the faculty's claim to peer review, the University has not countermanded the recommendation of the faculty (including that of the dean, who is a member of the faculty) in at least half a century. Ausness Decl.

The claim to peer review made by the law faculty is reflected in the opinions of the Supreme Court, which recognize a right to "autonomous decisionmaking of the academy itself" embodied in the right "to determine for itself on academic grounds who may teach." *Widmar v. Vincent*, 454 U.S. 263, 276 (1981); *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985). The Court recognizes this right because such determinations "require an expert evaluation of cumulative information." *Id.* at 226. When a court sometimes loosely refers to the right to academic autonomy as belonging to the "university", it means the "faculty", whose "professional judgment", the Supreme Court has said, the courts "may not override[.]" *Id.* at 225. For the courts, "a community of scholars . . . is what a university is." *Greene v. Howard University*, 412 F. 2d 1128, 1135 (D.C. Cir. 1969).

The claim to peer review made by the law faculty is also reflected in additional AAUP policy statements, which the courts treat as persuasive authority regarding university governance. *See, e.g.*, *Mayberry v. Dees*, 663 F. 2d 502, 513 (4th Cir. 1981); *Gray v. Board of Higher Educ., City of New York*, 692 F. 2d 901, 907 (2d Cir. 1982). In a 1967 statement "jointly  formulated"  with the American Council of Education and the Association of Governing Boards of Universities and Colleges, the AAUP declared that "[d]eterminations" regarding "appointments, reappointments, decisions not to reappoint, promotions, the granting of tenure, and dismissal" "should first be by faculty action" and that "[t]he governing board and president should" "concur with the faculty judgment except in rare instances and for compelling reasons." 1967 Statement, Ex. 31 at 123; *see also* 2006 Statement, Ex. 32 at 129.

10

**(3) Forcing the Faculty to Accept a Leader That the Faculty Has Judged Unqualified Significantly Affects the Faculty's Ability to Convey The Message That They Are Subject to Peer Review**

The University Defendants' attempt to force the faculty to accept a leader to whom the faculty objects "significantly affect[s]" the faculty's ability to advocate its view that faculty advancement must be determined by the faculty. In *Boy Scouts of America v. Dale*, the Supreme Court held that forced inclusion of a member who would have a "leadership" role in the organization "significantly affected" the group's ability to advocate a viewpoint because it "force[d] the organization to send a message" that the group "accepts" members who do not "model" the group's views. 530 U.S. at 652–53.

Here, the University's selection of a new dean over the objection of the faculty forces the faculty to accept a member whom the faculty do not want. The faculty associate to send the message that they control their professional advancement based on their judgment of faculty scholarship. In consequence, a member of the faculty is anyone who exercises control over the professional advancement of members of the faculty based on their judgment of faculty scholarship. Because the dean will exercise such control, the University's appointment of the dean over the objection of the faculty forces the faculty to accept a member whom the faculty do not want. AR Org. §§ E.3.c, E.5.c, F.2.c, F.2.e, Ex. 22 at 6, 9, 12–15; AR 3:10 Perf. Rev. § A.1, Ex. 23 at 2. The University's decision to forego "seeking tenure" for Van Tatenhove does not change this analysis because the University has not promised to strip Van Tatenhove of his power to control faculty advancement based on his judgment of their scholarship. Comm. Min. Ex. 14 at 7. And anyway University regulations define the membership of the faculty as including the dean. AR Org. §§ E.3.a, F.2.c, Ex. 22 at 5, 12. The regulations do not condition this faculty status on appointment with tenure.

The forced acceptance of Van Tatenhove as a member of the faculty significantly affects the expressive association of the faculty because Van Tatenhove's presence on the faculty over the

11

faculty's objection "model[s]" the opposite of the message that the faculty wish to send about peer review. *Dale*, 530 U.S. at 652. The faculty associate to send the message that their professional advancement is subject to peer review. When the University appoints a faculty member whom the faculty have judged not to be a peer, the University "force[s] the" faculty "to send [the] message" that their advancement does not depend on the judgment of peers after all. *Id.* at 653. That is a violation of the right of expressive association under *Dale*.

The University has not just forced the faculty to accept a member that it does not want, but has also forced the faculty to accept a *leader* that it does not want. The dean is "chief academic and executive officer" of the law school, "chair of the college faculty and an ex officio member of all college committees", may "depart from recommendations" of the rest of the faculty if he "believes it necessary", and "speak[s] for the college". AR Org. §§ F.1, F.2.c, Ex. 22 at 10, 12–13; Offer Ltr., Ex. 11 at 2. An action that "limits" an association's "discretion in how to . . . select its leaders" places a *per se* unconstitutional "burden" on the group's associational rights. *Eu*, 489 U.S. at 230–31.

**(4) The Public Concern and Employee Speech Tests Are a Poor Fit in a Case Involving the Compelled Speech of a Broad Category of Employees and, in Any Case, the Tests Are Satisfied Because the Faculty's Claim to Autonomy Is a Matter of Public Concern and Is Either Protected Scholarly Speech or Private Citizen Speech**

Courts sometimes apply the "*Pickering* framework" to require that public employee speech be on a matter of public concern and the speech of a private citizen as opposed to an employee in order to garner First Amendment protection. But in *Janus v. American Federation of State, County, and Municipal Employees, Council 31*, the Supreme Court declared that framework to be a "painful fit" in cases that involve a public employer's attempt to "compel[]" the speech of a "broad categor[y] of employees", such as the law faculty category at issue in this case. 585 U.S. 878, 905–08 (2018). Accordingly, this Court should not require that the faculty's speech be on a matter of public concern or be the speech of a private citizen as opposed to an employee. *Cf. Lynch v. Ackley*, 811 F. 3d 569, 583 n.15 (2d Cir.

12

2016) (stating that the applicability of the employee speech requirement to association claims is "unclear"). Regardless, both requirements are satisfied here.

**Public Concern.** A message is on a matter of public concern if, taking account of the "content, form, and context of the statement", but not "motive[]", it "relates to any matter of political, social, or other concern to the community". *Rodgers v. Banks*, 344 F. 3d 587, 596 (6th Cir. 2003); *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004); *Chappel v. Montgomery County Fire Protection*, 131 F. 3d 564, 575–76, 578 (6th Cir. 1997). The faculty's message that its scholarship is tested by peer review is a matter of public concern. "Academic freedom" "thrives" on "autonomous decisionmaking by the academy". *Ewing*, 474 U.S. at 226 n.12. And "[a]cademic freedom" is "of transcendent value to all of us and not merely to the teachers concerned". *Keyishian v. Board of Regents of Univ. of State of NY*, 385 U.S. 589, 603 (1966). Moreover, because "society at large fails to get from its scholars . . . the service which it is the office of the professional scholar to furnish" when the faculty is not autonomous, the faculty's message is "information . . . needed . . . to enable the members of society to make informed decisions about" whether the government is managing their publicly-funded law school appropriately. *Farhat*, 370 F. 3d at 590; 1915 Decl., Ex. 27 at 294–95.

**Employer Speech**. "When public employees speak as agents of public employers," their speech receives no protection because "this speech is effectively the government's." *DeCrane v. Eckart*, 12 F. 4th 586, 595 (6th Cir. 2021). Here, the faculty's message of peer review is not government speech. When the faculty send the message that their professional advancement depends on peer review, the faculty is declaring itself "autonomous" in relation to the University administration in matters of professional advancement based on scholarly achievement. *Ewing*, 474 U.S. at 226 n.12. Such a declaration of independence from University administrators cannot be the speech of an agent of the University or indeed "effectively the government's". *Cf.* Restatement (Third) of Agency § 3.10(1) (Am. Law Inst. 2006) (stating that "an agent's actual authority terminates if the agent renounces it").

13

The faculty's speech is also protected because it counts as scholarship. In *Meriwether v. Hartop*, this Court distinguished between the "non-ideological ministerial task[s]" of professors, such as "call[ing] roll at the start of class", which amount to employer speech and receive no protection, and "core academic functions, such as teaching and scholarship", which remain the protected speech of the professors. 992 F. 3d 492, 505, 507 (6th Cir. 2021). The message sent by the law faculty that it is subject to peer review is a "core academic function" because that message is what sets scholarship apart from mere research reports. That message invites the public to view the faculty's conclusions as those of experts motivated by "a desire for the respect of their fellow experts" rather than the favor of University administrators. 1915 Decl., Ex. 27 at 294.

**(5) The Government Has No Countervailing Interest in Imposing a Dean Whom the Law Faculty Reject**

If this Court chooses to apply the *Pickering* framework despite *Janus*, the burden shifts to the University Defendants to show that the University's "interest in promoting efficiency in the educational services that it provides and in avoiding disruption to its operations" "outweigh[s]" the faculty's "right to free speech and academic freedom." *Hardy v. Jefferson Community College*, 260 F. 3d 671, 680 (6th Cir. 2001); *Myers v. City of Centerville, Ohio*, 41 F. 4th 746, 764–65 (6th Cir. 2022) (regarding burden). In determining the University's interest in promoting efficiency and avoiding disruption, this Court considers whether an employee's message "meaningfully interferes" with the performance of its duties or employer mission, creates disharmony, undercuts discipline, or destroys a relationship of trust or confidence. *Hardy*, 260 F. 3d. at 680–81. The University's Defendants' justifications for appointing Van Tatenhove—that he has "vision", "commitment", "dedication to service and leadership", and "executive, fundraising, and workforce-development skills"—do not suggest that the faculty's message of peer review causes any of these harms. Announc., Ex. 17 at 1–2; Bd. Min. 4/24/26, Ex. 15 at 3. Moreover, the substance of the faculty's message precludes the

14

University Defendants from meeting their burden. The faculty's message of peer review cannot interfere with their duties or create disharmony because University regulations already accord the faculty, including their dean, primary authority over hiring, salary, and promotion and require the faculty to comply with ABA standards which guarantee the same. AR Org. §§ E.3.c, E.5.c, F.2.c, F.2.e, Ex. 22 at 6, 9, 12–15; ABA Standards 201(b), 203(b), Interp. 203-1, Ex. 19 at 13–14. The faculty's message of peer review cannot undermine the University's mission because the University's mission, similar to the faculty's mission, is to "[e]xpand[] knowledge through . . . scholarship", and, as argued above, any mission to expand knowledge implies a commitment to peer review. Univ. Mission, Ex. 18 at 3; 1915 Decl., Ex. 27 at 294–95, 300. The faculty's message cannot undercut discipline because the faculty claims only a right to determine its own professional advancement *based on scholarly achievement*—what the 1915 Declaration calls "matters of opinion" as opposed to matters of conduct. *Id.* at 300. "Lay governing boards" and University administrators remain free "to judge [faculty] concerning habitual neglect of assigned duties" and "charges of grave moral delinquency". *Id.* Finally, the message the faculty wish to send cannot "destroy[] a relationship of trust or confidence" because faculty do not "exercise[]" "discretionary authority with respect to enforcement of [a] law" or "control[] the lines of communication to" someone who does, as required for this employer interest to apply. *Rose v. Stephens*, 291 F. 3d 917, 924 (6th Cir. 2002).[3]

---

[3] In *Janus*, the Court applied the more demanding "exacting scrutiny" standard, which requires that the government action "serve a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." 585 U.S. at 894–95. Even if the University Defendants' professed justifications survive intermediate scrutiny, they must fail this stricter test because the justifications all amount to claims of "administrative convenience", which the Supreme Court has held are insufficient to establish a compelling state interest. *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973). And the University Defendants have made no effort to explain why the three other candidates deemed acceptable by the faculty, each of whom represents a "significantly less restrictive" alternative, would be a less effective administrator. Unable to meet their burden under either standard, the University Defendants have violated Woodcock's right to expressive association.

15

**b) Van Tatenhove Conspired with the University Defendants to Deprive Woodcock of His Right to Expressive Association**

Van Tatenhove is liable for the acts of the University Defendants, as well as his own attempts to obtain the deanship, because he conspired with DiPaola and Capilouto to be appointed to the deanship over the objection of the faculty.[4] "[P]rivate parties who conspire with public actors to violate constitutional rights act under color of law for purposes of § 1983" and are "liable for the actions of another" participant in the conspiracy. *Rudd*, 977 F. 3d at 512–13 (cleaned up). To establish a conspiracy under Section 1983, "[a] plaintiff must prove [(1)] that a single plan existed, [(2)] that each alleged conspirator shared in the general conspiratorial objective, and [(3)] that an overt act was committed in furtherance of the conspiracy." *Id.* at 517 (cleaned up).

There was a single plan to appoint Van Tatenhove as the next dean of the law school over the objection of the faculty. The employment contract appointing Van Tatenhove as the next dean, which was signed by Van Tatenhove and DiPaola and approved by Capilouto, proves the plan. Offer Ltr., Ex. 11 at 4; Comm. Min. Ex. 14 at 7 (regarding Capilouto's approval). DiPaola and Capilouto extended the offer to Van Tatenhove after the faculty had informed them that the faculty opposed Van Tatenhove's candidacy. Fac. Email 2/4/26, Ex. 8 at 2; Offer Ltr., Ex. 11 at 2; Comm. Min. Ex. 14 at 7 (regarding DiPaola's "review [of] feedback" with Capilouto). And "the law charges" Van Tatenhove, as a private actor contracting with the government, "with the knowledge of any and all limitations upon [the] power" of government agents like DiPaola and Capilouto to bind the government to a contract with him. Thus, Van Tatenhove had constructive knowledge that under University regulations, accreditation standards, and the First Amendment, the University could not appoint him dean over the objection of the faculty. *Kentucky v. Whitworth*, 74 S.W. 3d 695, 699–700

---

[4] Each of the University Defendants was individually responsible for depriving Woodcock of his rights because the faculty informed DiPaola of their objection to Van Tatenhove on February 4 and DiPaola and Capilouto jointly "review feedback" and "make final decisions" on dean appointments. Ex. 8 at 2; Ex. 15 at 3; Ex. 14 at 7.

16

(Ky. 2002). The single plan is also reflected in the defense of the appointment mounted by the University Defendants at board meetings after the faculty's objection had become public. Bd. Min. 4/24/26, Ex. 15 at 3; Comm. Min. Ex. 14 at 7. And it is reflected in Van Tatenhove's presence at one such meeting, at which DiPaola introduced him as incoming dean and Van Tatenhove then defended his appointment to reporters. Comm. Min. Ex. 14 at 7; Courier J. 4/24/26, Ex. 13 at 1–3. These actions also establish that each man shared in the general conspiratorial objective of obtaining a dean appointment for Van Tatenhove and carried out overt acts in furtherance of the conspiracy.

## 2. Woodcock Has a Strong Likelihood of Success on His Tortious Interference with Contract Claim Against Van Tatenhove

Van Tatenhove tortiously interfered with Woodcock's contract with the University for compliance with accreditation requirements. "To recover for a claim for intentional interference with contractual relations, a plaintiff must establish the following elements: (1) the existence of a contract; (2) [the d]efendant['s] knowledge of this contract; (3) that [the defendant] intended to cause its breach; (4) [the defendant's] conduct caused the breach; (5) this breach resulted in damages to [the plaintiff]; and (6) [the d]efendant had no privilege or justification to excuse its conduct." *Epps Chevrolet Co. v. Nissan North America, Inc.*, 99 F. Supp. 3d 692, 704 (E.D. Ky. 2015). Each is satisfied.

***Existence of a Contract.*** The University's Employee Code binds the University to ensure that all its employees, including Capilouto and DiPaola, do not violate the accreditation rules of the ABA. The code states that "employees must comply with . . . accreditation requirements." Employee Code § I.D, Ex. 20 at 1. In authorizing the University's president to create the code, governing regulations issued by the board state that the code should be "guided by the core value[] of . . . institutional responsibility and accountability[.]" GR I Decl. Princip. § E, Ex. 26 at 4. Woodcock's signed employment contract incorporates by reference the University's governing and administrative regulations, including the code. The document "clear[ly] refer[s]" to the regulations and signals that

17

they "control, decide, or affect" the contract because it describes Woodcock's position using terms that are only defined in University regulations (e.g., it appoints him "Assistant Professor" in "our Regular Title Series") and states that his "responsibilities" are "as outlined in the . . . University of Kentucky rules and regulations." Ex. 21 at 1; AR 2.1-1 § V.A., Ex. 39 at 3 (defining Assistant Professor); AR 2.2-1 § III.B.1(a), Ex. 38 at 2 (defining Regular Title Series); *University of Kentucky v. Regard,* 670 S.W. 3d 903, 913 (Ky. 2023); *Britt v. University of Louisville*, 628 S.W. 3d 1, 8 (Ky. 2021). And the code shares "mutuality of subject matter" with the document because it governs the behavior of employees. *Regard*, 670 S.W. 3d at 914. The governing and administrative regulations also create an "implied contract" with Woodcock because they constitute an "express personnel policy", Woodcock "continues to work while the policy remains in effect" and "the language used in the personnel policy is not precatory [and] there is no disclaimer". *Parts Depot, Inc. v. Beiswenger*, 170 S.W. 3d 354, 363–64 (Ky. 2005); *see Crenshaw v. Erskine College*, 850 S.E. 2d 1, 20 (S.C. 2020) (stating that "tenure leaves" "no doubt that the Faculty Manual is a contract"). The language of the code and governing regulations is mandatory ("must", "obligation", "ensure", "comply") and punishes violations with termination. GR I Decl. Princip. § E, Ex. 26 at 4; Employee Code § D, Ex. 20 at 1. And there is no disclaimer. Instead, the University's Faculty Handbook refers to "the contract between the faculty member and the institution" and states that "[s]pecific questions regarding the rights and duties of University employees - including faculty employees - can only be resolved by reference to the appropriate official documents", which it describes as including "the Governing Regulations, and the Administrative Regulations (GR and AR)[.]" Ex. 40 at 1.

**Knowledge of the Contract.** In jurisdictions that, like Kentucky, apply Section 766 of the Restatement (Second) of Torts, "it is sufficient that defendant had knowledge of facts which, if followed by inquiry ordinarily made by a reasonable and prudent person, would have led to a disclosure of the contractual relationship." *Tele-Port, Inc. v. Ameritech Mobile Communications*, 49 F.

18

Supp. 2d 1089, 1092 (E.D. Wis. 1999); *Ventas, Inc. v. HCP, Inc.*, 647 F. 3d 291, 309 (6th Cir. 2011);

Eric Voigt, *Driving through the Dense Fog*, 55 Clev. St. L. Rev. 339, 348–49 & n.35, 351 (2007)

(collecting cases) [hereinafter Voigt].[5] Here, Van Tatenhove knew about the contract at the time that

he applied for and was appointed dean because, in his role as District Judge, he had presided over a

case involving a professor's alleged violation of the section of a predecessor of the University's

employee code that required compliance with accreditations rules (Section B). GR XIV §§ A, B, Ex.

41 at 2–3; Cunningham Charges, Ex. 42 at 3–4, 21. One of Van Tatenhove's six separate opinions in

the case discussed a University governing regulation and the tenured faculty member's contract in

detail. *Cunningham v. Blackwell*, 568 F. Supp. 3d 799, 813–16 (E.D. Ky. 2021). Van Tatenhove was

also aware of the Kentucky legal doctrine recognizing personnel policies, such as the employee code,

as binding implied contracts because he had applied the doctrine in another case. *Fbk Partners, Inc. v.

Thomas*, No. Civil No. 09-292-GFVT, slip op. 11-12 (E.D. Ky. Nov. 30, 2010) (discussing *Parts Depot

v. Beiswenger*, 170 S.W.3d 354, 362–63 (Ky. 2005)). A reasonable person in possession of these facts

would either have actual knowledge of a contract requiring compliance with ABA standards or

reason to inquire whether one existed.

**Intent to Cause Breach.** "It is sufficient that" the interferor "designs the result" "because he

regards it as a necessary, even if regrettable, means to some other end[.]" *Knight Enterprises, Inc. v.

RPF Oil, Co.*, 829 N.W. 2d 345, 348–49 (Mich. Ct. App. 2013) (quoting Restatement (Second) of

Torts § 766). "Ill will" is not required. *National Coll. Athletic Ass'n v. Hornung*, 754 S.W. 2d 855, 859

(Ky. 1988) (quoting Restatement (Second) of Torts § 766 cmt. s). Here, Van Tatenhove learned that

his appointment violated ABA rules no later than April 23, when he attended a board committee

---

[5] This Court once cited a Sixth Circuit not precedential opinion applying Ohio law to "suggest" that Kentucky requires "actual knowledge" of the contract. *Outfront Media, LLC v. LeMaster*, 399 F. Supp. 3d 671, 692 (E.D. Ky. 2019). But the Sixth Circuit ultimately applied the Restatement's standard, holding that a plaintiff "need only provide sufficient evidence to support a 'reasonable inference'" of knowledge of the contract. *Crown Equipment Corp. v. Toyota Material Handling, U.S.A., Inc.*, No. 05-4476, slip op. 7 (6th Cir. Oct. 27, 2006).

meeting in which DiPaola "mentioned" the "email" "he received" "which opposed Van Tatenhove's appointment on behalf of" the faculty and DiPaola argued in response that "it would be a number of years before we're reviewed again by the ABA". Herald Leader 4/24/26, Ex. 43 at 3; Courier J. 4/24/26, Ex. 13 at 1–3. That day, Van Tatenhove affirmed his intent to become dean regardless of any violation of ABA standards when he defended his appointment to reporters at the meeting and to faculty having "strong disagreement" with him. *Id.* at 2–3. These facts establish that Van Tatenhove "designs [the] result" of a breach of ABA rules "as a necessary" "means to [the] end" of achieving, as he put it, the "honor[]" and "excite[ment]" of being "appointed dean of my alma mater." *Id.* at 1–2; *Knight Enterprises*, 829 N.W. 2d at 348–49.

**Van Tatenhove's Conduct Caused the Breach.** On a motion for prospective relief, the plaintiff must show that the defendant is responsible for an "imminent" breach. *Belden Corp. v. InterNorth, Inc.*, 90 Ill. App. 3d 547, 533 (1980). That is the case here. ABA Interpretation 203-1 states that "[e]xcept for good cause, a dean should not be appointed" "over the stated objection of a substantial majority of the faculty." ABA Standards Interp. 203-1, Ex. 19 at 14. The faculty informed DiPaola on February 4 that "[a] substantial majority of the faculty found [Van Tatenhove] to be unacceptable to be our next Dean." Fac. Email 2/4/26, Ex. 8 at 1. Accordingly, the appointment of Van Tatenhove as dean violates Interpretation 203-1 unless there is "good cause." Read in conjunction with AAUP guidance, which requires "compelling reasons stated in detail to justify . . . overriding of the faculty judgment", "good cause" requires that University Defendants (1) provide "compelling" or "good" reasons why they have chosen to "overrid[e]" "the faculty judgment" that the three other finalists were better candidates, and (2) "state[]" them "in detail." 2006 Statement, Ex. 32 at 129. The University Defendants have failed to meet this standard. The University Defendants' argument that Van Tatenhove has "vision", "commitment", "dedication to service and leadership", and "executive, fundraising, and workforce-development skills" does not "state[]" their

20

reasons "in detail" and fails to address the objections of the faculty that Van Tatenhove (1) lacks any "*academic* leadership experience" or (2) the scholarly record necessary "to be granted tenure" at the law school. Announc., Ex. 17 at 1–2; Bd. Min. 4/24/26, Ex. 15 at 3; Fac. Email, Ex. 8 at 1–2 (emphasis added). Van Tatenhove's imminent appointment on July 15 will therefore place the law school in violation of an ABA rule and hence of Woodcock's contractual right to compliance with ABA rules. Because "Van Tatenhove will not seek tenure", his imminent appointment will also breach ABA Standard 203(b), which states that "[e]xcept in extraordinary circumstances, a dean shall also hold appointment as a member of the faculty with tenure". ABA Standards § 203(b), Ex. 19 at 14; Herald Leader 4/24/26, Ex. 43 at 1. As in the case of "good cause", the University Defendants must explain why "extraordinary circumstances" precluded them from selecting one of the three other candidates whom the faculty ruled "acceptable". Fac. Email 2/4/26, Ex. 8 at 1. DiPaola has neither explained why the circumstances that he identified—"financial pressures", "workforce alignment needs", "demand for new academic programs", "artificial intelligence", and "the need for external fundraising"—are "extraordinary" nor why they precluded selection of any of the three finalists approved by the faculty. Comm. Min., Ex. 14 at 7. Thus, Breach of ABA Standard 203(b) is imminent as well.

**Damages.** There must be "pecuniary harm" but "a certain amount of realized money damages" is not required. *Kaplan v. University of Louisville*, No. 2021-CA-0166-MR, slip op. at 14 (Ky. Ct. App. Jan. 28, 2022) (not precedential); *Harrodsburg Indus. Warehousing v. Migs, LLC*, 182 S.W. 3d 529, 533 (Ky. Ct. App. 2005). The breach will cause damage to Woodcock. To become a scholar, he gave up a career in corporate law that, at this career stage, would have paid him at least twice his current annual earnings at the University of Kentucky. *Compare* Ex. 46 at 1–2, Ex. 26 at 26 *with* Ex. 45 at 1. This move was nevertheless a net economic *gain* for Woodcock because appointment at a law school confers additional value on him that is worth at least as much as the pay cut, including the value

21

afforded by peer review, which enables his research to command the respect and attention of the public. Woodcock Decl. ¶¶ 1–9, 14; 1915 Decl., Ex. 27 at 294. The ABA rules that the University will imminently violate protect peer review by ensuring that the faculty decide who may lead them in making hiring, salary, and promotion decisions (Interpetation 203-1) and that the person the faculty choose has the requisite training in the pursuit of truth to judge wisely (Standard 203(b)). Breach of these rules places someone whom the faculty has judged unqualified, and who lacks scholarly training, in the position of leading peer review, undermining the confidence of the public in the faculty's scholarship and reducing the value of the platform that the University has supplied to Woodcock in exchange for his acceptance of a massive pay cut. Woodcock Decl. ¶¶ 10–16. The outpouring of public concern regarding possible political influence in Van Tatenhove's appointment, past attempts by an outside supporter of Van Tatenhove to influence dean selection, and Woodcock's own experience suffering retaliation for his speech at the hands of an interim dean who, like Van Tatenhove, lacks a scholarly record, reinforce the inference that the appointment degrades the value of the peer review platform. *Id.* at ¶¶ 17–20; Governor Followup, Ex. 47 at 1. This reduction in the value of Woodcock's expectancy interest in the contract started the moment that DiPaola announced the appointment on March 6 because, starting at that moment, Woodcock could expect that his professional advancement would depend upon future judgment of his *current* scholarship by someone whom the faculty had determined to be unqualified. Ex. 17 at 1.

**Lack of Justification.** "[I]nducing a breach of contract absent compelling justification is, in and of itself, improper" and "malice is not required." *Mathis v. Liu*, 276 F. 3d 1027, 1030 (8th Cir. 2002); *Hornung*, 754 S.W. 2d at 859 ("proof of lack of justification" suffices to show interference improper); Voigt, 55 Clev. St. L. Rev. at 383–84 & nn. 204–05. Van Tatenhove interfered to enjoy "honor[]", "excite[ment]", $442,000 in annual pay additional to his $249,900 judicial pension, plus a $1.3 million

golden parachute. Courier J. 4/24/26, Ex. 13 at 1–2; Complaint ¶ 15 & n.2. The pursuit of honor

and wealth are not compelling justifications for interference with contract.[6]

## B.  The Appointment of Van Tatenhove Irreparably Harms Woodcock

***Expressive Association.*** "In First Amendment cases", "the crucial inquiry is" likelihood of

success on the merits "because the issues of the public interest and harm to the respective parties

largely depend on the constitutionality of the state action." *Bays v. City of Fairborn*, 668 F. 3d 814, 819

(6th Cir. 2012) (cleaned up); *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F. 3d 566, 578 (6th

Cir. 2002). In particular, "[t]he loss of First Amendment freedoms, for even minimal periods of

time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Here,

Defendants have diluted Woodcock's message of peer review or compelled him to send the

opposite message, in violation of his First Amendment right to expressive association, by forcing the

faculty to which Woodcock belongs to accept a leader that it does not want. Defendants significantly

affected Woodcock's speech the moment that the University announced Van Tatenhove as the new

dean, as the selection of a dean rejected by the faculty sent the signal that Woodcock's professional

advancement would henceforth be based on judgment of his scholarship by a non-peer. Woodcock

will suffer irreparable injury continuously until the appointment is rescinded.

***Tortious Interference.*** There is irreparable harm "if the nature of the plaintiff's loss would

make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F. 2d 507, 511 (6th Cir. 1992).

That is the case here. The wage differential between law practice and law teaching places a market

---

[6] In the case of non-at-will contracts such as Plaintiff's contract of tenure, which are entitled to greater protection because "a plaintiff has a" "stronger claim to security", Kentucky courts have recognized only two compelling justifications. Ex. 48 at 1 (noticing Woodcock's "[c]ontinous" appointment); Voigt, 55 Clev. St. L. Rev. at 366 (quoting Restatement (Second) of Torts § 767 cmt. e (1979)) (cleaned up). The first is that the defendant interfered by way of "a civil action completely and finally resolved in favor of" the defendant. *Harrodsburg*, 182 S.W. 3d at 534. The second is that the defendant interfered by way of the "assert[ion] of legitimate contract rights" such as a right of the defendant, specified in the contract, to disapprove of the agreement. *Blair v. General Motors Corp.*, 838 F. Supp. 1196, 1200 (W.D. Ky. 1993). Neither of these justifications applies here.

23

value on the bundle of services that universities provide to their law faculty employees—including the platform associated with peer review—which industry does not provide to its lawyer employees. But the market does not itemize that value, so it is difficult to calculate the portion of that differential corresponding to the value of the peer review platform that Defendants are now degrading. In consequence, any remedy provided after a trial will not be able "to place the plaintiff in the position he would be in if the contract had been fulfilled" over the course of the litigation. *Anyconnect (US) v. Williamsburg Place, LLC*, 636 S.W. 3d 556, 564 (Ky. Ct. App. 2021).

Harm is also irreparable where "it will be impossible as a practical matter to undo the" challenged acts. *Federal Trade Commission v. HJ Heinz Co.*, 246 F. 3d 708, 726 (D.C. Cir. 2001) (cleaned up). By reducing the value of the peer review platform that the law school offers faculty, Van Tatenhove's appointment will cause some "[g]ood" faculty to "leave" and "[n]ew candidates" to be "repelled" from joining the faculty. Michael Email, Ex. 36 at 1. Indeed, as the University's general counsel has observed, "faculty members will simply leave if they feel the public institution is overly regulating their activities[.]" William E. Thro et al., *The Constitution on Campus* 18 (Bloomsbury 2022). But this Court will be powerless to order scholars repelled during the litigation to join the faculty later because "labor" "compelled by" "force of law" is "involuntary servitude". *United States v. Kozminski*, 487 U.S. 931, 943 (1988). Changes to the composition of the faculty brought about by a non-peer permanently reduce, relative to expectation, the capacity of the faculty to conduct peer review for the scholars who remain.

## C. The Public Interest and Lack of Harm to Others Favor Grant of the Motion

In this case, the public shares the faculty's interest in autonomy because autonomy ensures that: (1) the public obtains the "genuine and uncolored product" of the faculty's "stud[ies]" rather than research "shaped or restricted by" "[]interested persons outside of their ranks" (the First

24

Amendment interest); and (2) the public's university attracts the best scholars to the commonwealth at lowest financial cost by supplying them with a valuable peer review platform in exchange for lower pay (the tortious interference interest). 1915 Decl., Ex. 27 at 294. In addition, with respect to the First Amendment claim, "it is always in the public interest to prevent violation of a party's constitutional rights". *Bays*, 668 F. 3d at 825 (cleaned up). And, with respect to the tortious interference claim, the public has an interest in ensuring that Woodcock benefits according to "the terms of the bargain [he] entered into." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007).

The government might have an interest in preventing delay in the initiation of the medium- or long-term planning services that a dean provides, but such delay is preferable to allowing a non-peer dean to cause changes to the faculty that cannot be "unscrambled" after the litigation. *Heinz Co.*, 246 F. 3d at 726. And Van Tatenhove's $249,000 federal pension will sustain him during the litigation. Ex. 11 at 1; Complaint ¶ 15 & n.2. Moreover, neither Van Tatenhove nor the University Defendants "can[] place [themselves] in harm[']s way" by arranging the appointment of Van Tatenhove over the objection of the faculty, then double down after public outcry, and "later claim that an injunction should not issue because of costs which [they] must incur in order to remedy [their] own misconduct." *Midwest Guaranty Bank v. Guaranty Bank*, 270 F. Supp. 2d 900, 924 (E.D. Mich. 2003); *Churchill Downs Tech. Initiatives Co. V. Mich. Gaming Control Bd.*, No. 25-1235, slip op. at 15 (6th Cir. Dec. 16, 2025) ("self-inflicted" "loss" "outweighed" by "harm to plaintiff"). And, anyway, because, as here, "the plaintiff shows a substantial likelihood that" Defendants violated a constitutional right, "no substantial harm to others can be said to inhere in [the right's] enjoinment." *Bays*, 668 F. 3d at 825 (cleaned up).

**CONCLUSION**

WHEREFORE, Woodcock requests a temporary restraining order and preliminary injunction.

25

Respectfully submitted,

/s/ *Rima N. Kapitan* (admitted *pro hac vice*)

/s/ Joe F. Childers
Joe F. Childers
JOE F. CHILDERS & ASSOCIATES
The Lexington Building
201 West Short Street
Suite 300
Lexington, Kentucky 40507
(859) 253-9824
joe@jchilderslaw.com

**Kapitan Gomaa Law, P.C.**
Rima Kapitan (IL Atty No. 6286541)
P.O. Box 46503
Chicago, IL 60646
(312) 566-9590
rima@kapitangomaa.com

26